2004 WY 35

**EOG RESOURCES, INC., formerly Enron Oil and Gas Corporation, a Delaware corporation, Appellant (Petitioner),**

v.

**DEPARTMENT OF REVENUE, State of Wyoming, Appellee (Respondent).**

No. 02–231.

Supreme Court of Wyoming.

March 31, 2004.

Representing Appellant: Lawrence J. Wolfe and John P. Glode of Holland & Hart, LLP, Cheyenne, Wyoming; Judith M. Matlock of Davis, Graham & Stubbs, LLP, Denver, Colorado; Steven P. Williams, Assistant General Counsel–North America, EOG Resources, Inc., Denver, Colorado. Argument by Mr. Wolfe.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Appellant EOG Resources, Inc. (EOG) paid severance and ad valorum tax for severance of minerals as part of a financing arrangement known as a volumetric production payments (VPP) agreement.[1] The Department of Revenue (Department) reviewed the several transactions comprising the VPP agreement and determined that an arm's length sale of minerals had occurred. It calculated a valuation based on contract pricing and assessed additional tax and interest. The Board of Equalization (Board) affirmed the Department's actions although it limited the interest assessment. EOG appealed on the basis that the entirety of the VPP agreement constituted a financing agreement warranting treatment as a non-arm's length sale.

[¶ 2] We affirm the Board's order.

## ISSUES

[¶ 3] EOG presents this statement of the issues for our review:

A. Under Wyo. Stat. § 39–14–203(b)(v), only gas "sold" in a bona fide arm's length sale at or prior to the point of valuation is valued on the basis of such a sale. Cactus financed EOG's Wyoming oil and gas development by advancing EOG $326,775,000 in return for an ownership interest in, and the production from, a portion of EOG's Wyoming reserves. To repay this advance, EOG exchanged gas in Colorado and Texas for Cactus's Wyoming oil, gas, and condensate production. Did the Board err in concluding that the transfer of title to Cactus's production in Wyoming to EOG was an "arm's length sale" subject to valuation under Section 39–14–203(b)(v)?

B. Article 15, Section 11 of the Wyoming Constitution requires a uniform tax valuation for Wyoming oil and gas production. By treating the exchange of Cactus's Wyoming oil, gas, and condensate production for EOG's oil, gas and condensate in Texas and Colorado as an arm's length sale, the Board disregarded the full terms of the

---

1. The statute governing this transaction was Wyo. Stat. Ann. § 39–2–208 (Michie 1997). That statute has been revised and renumbered and is now found at Wyo. Stat. Ann. § 39–14–203 (LexisNexis 2003).

financing transaction between Cactus and EOG. Instead, the Board valued Cactus's Wyoming gas on the basis of index prices in distant markets without accounting for EOG's repayment obligations to Cactus. Under Article 15, Section 11 is it proper to value Wyoming oil, gas and condensate production on the basis of the index value of gas in distant markets?

C. Under § 39–14–203(b)(vi) the Department of Revenue is required to utilize one of four prescribed alternative valuation methods when the first arm's length sale of Wyoming oil and gas production occurs downstream of a brightline point of valuation defined for gas in §§ 39–14–203(b)(iv) as the outlet of the initial dehydrator. The delivery of Cactus's Wyoming gas production to EOG occurred downstream of this point. EOG therefore used the comparable value method to value its gas production. Was the Department required to apply one of the alternative valuation methods found in § 39–14–203(b)(vi)?

The Department presents the following statement of the issues:

A. Did the Board of Equalization correctly affirm the Department's valuation of EOG's production of "volumetric production payment" gas, which was conveyed arms-length by Cactus to EOG at the wellhead for valuable consideration, pursuant to Wyo. Stat. § 39–2–208(c)?

B. Did owner Cactus's conveyance of the Wyoming gas at the wellhead to EOG through an exchange for equivalent gas at locations in Texas and Colorado, which was ascribed a value equal to the index prices at the points in Texas and Colorado, and which was actually sold for the index prices at the locations in Texas and Colorado, constitute a taxable transaction pursuant to Wyo. Stat. § 39–2–208(c)?

C. May Cactus convey arms-length full title and ownership of extracted natural gas for valuable consideration at the wellhead as part of a purported financing transaction and thereby avoid tax liability?

D. Assuming Cactus conveyed gas arms-length to EOG for valuable consideration as part of a purported financing arrangement ("volumetric production payment"), is the sale of Wyoming gas within said financing arrangement exempt from severance and *ad valorem* taxation pursuant to WYO. STAT. § 39–2–208?

E. Was the Department of Revenue authorized to identify as the taxable value an arms-length sale for Wyoming gas at the wellhead pursuant to Wyo. Stat. § 39–2–208(c), in which the parties attributed a value to the gas equal to index prices from other localities, which were on the average higher than the sales prices of other Wyoming gas?

F. Did the Board of Equalization correctly reject EOG's efforts to raise untimely claims and issues regarding the point of valuation and the presence of dehydrators?

G. Did the Board of Equalization correctly conclude that EOG's untimely claim and argument that the presence of dehydrators inches or feet before the custody transfer meters within the same enclosure ("combo unit") were legally and factually inconsequential and did not render improper the application of Wyo. Stat. § 39–2–208(c)?

## FACTS

[¶ 4] EOG and its predecessors in interest have owned and operated wells in Lincoln and Sublette Counties since the 1950s and produce primarily from the LaBarge Platform and the Moxa Arch formations. In 1992, EOG owned and operated over 800 wells in Sublette and Lincoln Counties. EOG had a significant lease position and a huge reserve base but, because of low gas prices, EOG was unable to finance additional development of the reserves. In 1992, in order to finance the development of its oil and gas reserves, EOG made the decision to enter into a volumetric production payment transaction.

[¶ 5] A volumetric production payment is a common form of an oil and gas financing transaction that has been used for decades. A producer sells its production for a limited duration in exchange for capital funds. The buyer receives a share of oil and gas produced for a limited time, free and clear of any of the costs of production, and its production payment interest is a real property

interest of limited duration. Because the buyer owns the production, it has protection from the bankruptcy of the producer if the conveyance does not create a mortgage. Generally, production payment transactions consist of three documents, namely, a purchase and sales agreement, a conveyance, and a production and delivery agreement.

[¶ 6] In this case, the VPP transaction was entered into between EOG and Cactus Hydrocarbon 1992–A Limited Partnership II (Cactus) on September 25, 1992. The VPP transaction contained all three documents referenced above as well as another agreement providing for an exchange (Exchange Agreement). Under the purchase and sales agreement, Cactus gave EOG $326,775,000 in exchange for a production payment interest in reserves in the ground. EOG operated the properties subject to the VPP agreement and produced the oil and gas, including the oil and gas now owned by Cactus. Although Cactus' ownership made it responsible for reporting and paying taxes on its share of product, the VPP agreement provided that EOG would assume all responsibility for reporting and paying all applicable taxes.

[¶ 7] Of particular significance to this case is that the VPP transaction also included an Exchange Agreement where Cactus delivered the minerals back to EOG and, simultaneously, EOG agreed to deliver gas to Cactus at four locations in Colorado and Texas. The VPP documents specified that delivery from Cactus back to EOG was accomplished at meters close to the well site. This variation of the standard VPP agreement raised questions whether this exchange of product altered the VPP agreement's nature from a standard financing arrangement to an exchange on terms equivalent to cash, i.e., a sale. The amounts of gas delivered at the Colorado and Texas downstream locations were equivalent on an MMBTU [2] basis to the volumes of oil, gas and condensate delivered by Cactus to EOG at the Wyoming locations. More facts relating to the Exchange Agreement are provided below in the discussion section.

[¶ 8] Cactus executed a fifth document simultaneously with the Exchange Agreement. The fifth document, however, was between Cactus and a third party, Enron Gas Marketing, Inc. (EGM). Under the fifth document (EGM Purchase Agreement), Cactus sold the Colorado and Texas gas to EGM and priced it based on index pricing specific to those locations. The Board found that index pricing in those Colorado and Texas locations was generally higher than for Wyoming.

[¶ 9] The existence of this Exchange Agreement in conjunction with the EGM Purchase Agreement caused the Department to determine that this VPP transaction was something more than a financing arrangement. The Department's review of all five documents led to its conclusion that this Exchange Agreement resulted in an arm's length sale of natural gas [3] and based the fair market value on the index pricing referenced in the agreement. The Department also determined that the sale occurred at a point of valuation that required application of § 39–2–208(c).[4] EOG had reported a non-arm's length exchange of natural gas at the well head and applied an alternative tax method as provided in § 39–2–208(d).[5] The Department assessed additional severance tax liabil-

---

2. EOG explains that MMBTUs are a measure of the heating content or energy available in a fuel and constitute one million British Thermal Units. Gas is measured in MMBTUs but oil and condensate are normally measured in barrels.

3. The Department audit did not dispute the valuation method of any other type of mineral and none were at issue at the Board hearing.

4. Wyo. Stat. Ann. § 39–2–208(c) (Michie 1997) provides:

   If [natural gas is] sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in subsection (b) of this section, the fair cash market value shall be the value established by bona fide arms-length transaction.

5. Wyo. Stat. Ann. § 39–2–208(d) (Michie 1997) provides:

   In the event the [natural gas] is not sold at or prior to the point of valuation by bona fide arms-length sale ... [t]he department shall determine the fair cash market value by application of one (1) of the following methods:
   (i) Comparable sales—...
   (ii) Comparable value—...
   (iii) Netback—...
   (iv) Proportionate profits—....

ity in the amount of $1,723,952.02 and additional interest in the amount of $1,187,608. The increased ad valorem taxable value was calculated and certified to Sublette and Lincoln Counties for application of mill levies.

[¶ 10] Cactus, as owner of the oil and gas, was responsible for tax liabilities; however, the VPP transaction provided that EOG would report and pay all taxes, and it was EOG that appealed the Department's assessment to the Board. At a hearing before the Board, the Department contended that a sale had occurred at the meters and the valuation should be based on the fair market value of a bona fide arm's-length sale as provided by § 39–2–208(c). EOG contended that an exchange, not a sale, had occurred at the wellhead; however, if the Board determined that a sale had occurred at meters, EOG then contended that the Board must find that point was downstream and the valuation method would be determined by § 39–2–208(d).

[¶ 11] The Board held that a sale at the meters had occurred, and although EOG alleged that the correct valuation should have been pursuant to § 39–2–208(d), the Board ruled otherwise because EOG had failed to raise the issue during the audit and it was untimely to now raise the issue at hearing. The Board further found that the Department's determination should be upheld because the distance of the meters from the wellhead was too insignificant to allow downstream valuation. The Board did find, however, that EOG should not be assessed interest for the entire period. Other than that change, the Board affirmed the Department in all respects. EOG now appeals the Board's decision to this Court.

## DISCUSSION

*Standard of Review*

[¶ 12] Considerable deference is accorded to the findings of fact of the agency, and this Court does not disturb them unless they are contrary to the overwhelming weight of the evidence. *Amoco Production Co. v. Wyoming State Bd. of Equalization,* 12 P.3d 668, 671 (Wyo.2000). An agency's conclusions of law can be affirmed only if

they are in accord with the law. *Id.* at 672. Our function is to correct any error that an agency makes in its interpretation or application of the law. In addition, during our judicial review, we will invalidate agency findings or actions made without authority. *Id.*

*Valuation by Transaction Type*

[¶ 13] Natural gas is valued for taxation at its fair market value after the production process is completed. § 39–2–208(a). The production process for natural gas is completed "after extracting from the well, gathering, separating, injecting and any other activity which occurs **before the outlet of the initial dehydrator.**" § 39–2–208(b)(ii) (emphasis added). If natural gas is sold to a third party at or prior to this point of valuation, then the fair market value shall be the value established by bona fide arm's-length transaction. § 39–2–208(c). If natural gas is sold after that point, then an alternative method of valuation listed in the statute applies. § 39–2–208(d). The primary question for us is whether a sale occurred at all. The statute defines a bona fide arm's-length sale as "a transaction in cash or terms equivalent ... after reasonable exposure in a competitive market between a willing, well-informed and prudent buyer and seller with adverse economic interests." Wyo. Stat. Ann. § 39–14–201(a)(ii) (LexisNexis 2003). As the analysis that follows shows, we do find that a sale occurred and that sale occurred after the point of valuation.

[¶ 14] In its first issue, EOG contends that the Department erred in determining that the VPP transaction was an arm's-length sale and not a financing arrangement subject to lower valuation because the Department wrongly concluded that the exchange was a sale on terms equivalent to cash. EOG disagrees that the exchange of product that occurred was a critical variation. Although EOG contends that the exchange was a production payment, our review causes us to agree with the Department's conclusion that a sale occurred.

[¶ 15] Generally, a VPP transaction provides that in exchange for a large infusion of capital upfront, a producer conveys owner-

ship of production to the buyer for a limited duration. The buyer benefits primarily by gaining reliability in delivery and the buyer's ownership of the production protects it from a producer's bankruptcy. For federal income tax purposes, the seller is seen as borrowing money and mortgaging the minerals as security for the loan. The VPP financing transaction is often available to a producer when bank or mezzanine financing is not. Additional benefits gained by a producer are that the VPP is treated as a sale of revenue rather than debt and, because the producer retains control of operations, after the agreed upon production is delivered the producer receives still more capital from production after the VPP ends.

[¶ 16] Based on this description it is easy to see that the parties did enter into a financing transaction when Cactus exchanged over $326,000,000 for production ownership. Under this standard arrangement, the Department, the Board and EOG all correctly determined that § 39–2–208(d) would have applied for valuation purposes. However, the parties did not limit this transaction to that of a standard VPP arrangement, whereby Cactus received Wyoming production in exchange for upfront cash to EOG.

[¶ 17] The parties entered into a second agreement, the Exchange Agreement, entitling Cactus to receive higher priced Texas and Colorado production as repayment for its upfront cash to EOG. At the custody transfer meter, the minerals owned by Cactus were delivered by Cactus back to EOG. Simultaneously, EOG was required to deliver an equivalent amount of gas to Cactus at four locations in Colorado and Texas. The Exchange Agreement provided that if EOG failed to deliver product to Cactus in Colorado and Texas, EOG would pay the equivalent amount in cash. The value would be determined by index pricing relevant to those markets. Simultaneously to the Exchange Agreement, Cactus, which is composed of investors, sold the product received in Colorado and Texas to a third party (EGM) and valued that product by index pricing. The

Cactus/EGM transaction was entered into on September 25, 1992, referenced the VPP agreement and required EGM to pursue EOG in the event of any default. The VPP agreement was transferred to another group (Cactus III) and terminated in 1999.

[¶ 18] EOG reported and paid taxes pursuant to § 39–2–208(d) and in reliance upon a memo sent by the Department instructing all oil and gas producers to use the comparable value method to value the sales of production that were not sold by arm's length sales at the wellhead. In 1997, the Department began an audit of EOG's Lincoln and Sublette County production. Unfamiliar with a VPP as a form of financing, the representatives of the Department and the Attorney General's office met with EOG's representatives in Houston, Texas, and reviewed the VPP transaction documents. These documents revealed that after Cactus acquired title to EOG oil and gas production in exchange for cash, Cactus and EOG again exchanged product that Cactus sold to a third party, EGM.

[¶ 19] Based upon information from these documents, the Department determined that it must view the entire transaction as an arm's-length sale and based valuation on the index pricing referenced in the Cactus/EGM transaction where Cactus simultaneously resold the Texas and Colorado product to a third party for profit. Under this arrangement, Cactus was repaid faster by EOG, never had to take possession of any product, and its risk was further reduced by a clause in the exchange agreement that provided that if EOG failed to deliver the Texas and Colorado product, EOG would make a cash payment to Cactus in accordance with regional index pricing. That same regional index pricing controlled the sale between Cactus and EGM.

■ [¶ 20] EOG defends the Exchange Agreement transaction as the agreed upon repayment method required under the refinancing arrangement and argues vigorously that the exchange was not a bona fide arm's-length transaction as defined by statute,[6] and

---

6. Wyo. Stat. Ann. § 39–14–201(a)(ii) states: " 'Bona fide arm's-length sale' means a transaction in cash or terms equivalent to cash for

specified property rights after reasonable exposure in a competitive market between a willing, well informed and prudent buyer and seller with

therefore the Department was not permitted to base the valuation upon index pricing. Viewing the VPP transaction in its entirety, we agree with the Department that the VPP transaction was a variation of the standard financing arrangement that was not simply intended to provide financing, but was intended ultimately as a sale of product.

[¶ 21] Under the statute, valuation is determined by the type of transaction associated with the severance. § 39–2–208(c), (d). By this language, the legislature has directed that the Department and the Board view this transaction in its entirety. That review revealed that this transaction intended something beyond mere financing. A sale was intended based upon the "index pricing" referenced in the Exchange Agreement and the Department properly relied upon that index pricing as the parties' valuation of the product's fair market value. Our review agrees with this assessment of the transaction and neither those entities nor this Court is permitted to ignore legislative intent because the contracting parties designated the transaction as a financing arrangement. Producing natural gas by means of complex financing, brokering, and sales agreements may well warrant different valuation treatment; however, the present statutory scheme does not permit it and changing that scheme is a matter for the legislature and beyond the purview of this Court.

### Constitutional Requirement of Uniformity

[¶ 22] EOG's second issue disputes the Department's use of index pricing from the distant regions of Colorado and Texas without accounting for its repayment obligations to Cactus. The Department tells us that it routinely uses index pricing whenever an agreement references index pricing to determine contract price. The Board also found it routine and EOG fails to explain why this method is inappropriate for a sales transaction. We find that EOG's argument is relevant only if we had determined that a financing, rather than a sales, agreement existed.

Our decision is otherwise, and we do not further consider the issue.

### Point of Valuation

[¶ 23] Finally, EOG complains that if a sale did occur, it was not a sale at or prior to the point of valuation and the proper method of valuation was under § 39–2–208(d). The Board found:

> In its Motion for Reconsideration, Petitioner indulged in a hyper-technical argument that if the Department's position was correct that an arm's length sale took place at the custody transfer meter under the VPP documents, then the Department should have used an alternative valuation method under the statute because technically the gas sold a few feet away from the outlet of the dehydrator which is *downstream* from the statutory point of valuation. The Board finds this argument to be both breathtakingly ingenious and nonsensical at the same time. The reason why the Wyoming Legislature deemed it necessary to establish a point of valuation was because it was important to separate upstream production costs from downstream transportation costs, the latter being deductible from the gross value received by the producer at the wellhead. Many times this becomes important in gas fields where the wellheads, dehydrators and custody transfer meters are located miles apart. When the custody transfer meter and the outlet of the dehydrator are located virtually side-by-side as they are in this case, the distance is of no significance whatsoever. The Board found Petitioner's argument to be irrelevant at the hearing and after further reviewing the record, we find it to be irrelevant still.

EOG contends that the Board has no evidence supporting its legislative intent assertion, the point of valuation defined in § 39–2–208(b) is unambiguous and the definition establishes a legislative intent to draw a bright line as to when the Department may use arm's-length sales at or before this point and

adverse economic interests and assuming neither party is acting under undue compulsion or du-

ress[.]"

when it must resort to alternative valuation methods.

[¶ 24] The Department and the Board determined that a sale from Cactus back to EOG occurred after the outlet of the initial dehydrator at the custody transfer meter. Finding that the transfer occurred at the meter factored into the overall assessment that the production payment was a sale and not an exchange. Despite the statutory language indicating that this distinction would determine whether § 208(c) or (d) applied, the close physical proximity of the two points prompted the Board to deduce that the legislature intended for § 208(c) to apply. Legislative intent, however, must be derived from the plain language of the statute unless ambiguity exists. *Parker Land and Cattle Co. v. Wyoming Game and Fish Comm'n,* 845 P.2d 1040, 1042–43 (Wyo.1993). In this case, the statutory language unambiguously distinguishes between these two points with no reference to physical proximity. This provision, however, must be read as part of the whole statute. *Id.* at 1043–44. If § 208(d) applies, then the fair market value is the arms length sales price less processing and transportation fees. The Department advises us that finding error is pointless because the comparative value methodology will apply and no significant difference in valuation will result for EOG. The Board also concluded that because the custody transfer meters were next to the outlet, it was immaterial which valuation method was applied.

[¶ 25] EOG ignores this de minimis argument, contends that the statute's plain language must be enforced and requests that this court reverse and remand with instructions to determine which, if any, of the "sales" took place at or before the point of valuation. Based upon this response, we believe that although EOG is correct in its assertion that the Department did not correctly determine the point of valuation under § 208(b), we will uphold the Board's decision under the de minimis doctrine. Without any indication that the distance of the meter from the outlet measurably increased processing and transportation and any other costs dealt with by the comparative value method of

§ 208(d), a reversal and remand for recalculation is unnecessary.

## CONCLUSION

[¶ 26] A standard volumetric production payment is a financing arrangement; however, this VPP transaction included a series of exchanges for terms equivalent to cash based upon index pricing that produced an arms length sale. The point of valuation for the sale did require application of § 208(d); however, that error was not brought to the Department or Board's attention until well after the audit. At that point, the Board properly determined that the error was de minimis and it was not required to remand for a recalculation. The order of the Board is affirmed.