2006 WY 90

**BUEHNER BLOCK COMPANY, INC., Appellant (Petitioner),**

v.

**WYOMING DEPARTMENT OF REVENUE, Excise Tax Division, Appellee (Respondent).**

No. 05–175.

Supreme Court of Wyoming.

July 27, 2006.

Representing Appellant: John A. Coppede and Scott Homar of Hickey & Evans LLP, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General;

\* Chief Justice at time of oral argument.

and Ryan T. Schelhaas, Senior Assistant Attorney General. Argument by Mr. Schelhaas.

Before VOIGT, C.J., and GOLDEN, HILL \*, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] Buehner Block Company, Inc. (Buehner Block) manufactures concrete blocks in Utah and sells its products both inside and outside that state. Some of Buehner Block's customers are in Wyoming, and the company has held a Wyoming sales and use tax vendor's license. However, Buehner Block did not collect and remit Wyoming sales taxes for the sales at issue in this case. Following certification from the district court pursuant to W.R.A.P. 12.09(b), we affirm the decision of the Wyoming State Board of Equalization that Buehner Block was obligated to collect and remit Wyoming sales taxes for these transactions.

### ISSUES

[¶ 2] 1. Did the Board err in deciding that these sales were not exempt from Wyoming's sales tax authority under Wyo. Stat. Ann. § 39–15–105(a)(i)(A)?

2. Did the Board err in concluding that these sales were subject to Wyoming's sales tax authority despite the fact that title to the goods passed in Utah where the goods were transferred to a common carrier?

3. Did the Board err in any event in failing to give Buehner Block a claimed credit?

### FACTS

[¶ 3] Buehner Block is a Utah corporation operating out of Salt Lake City. It manufactures and sells concrete blocks throughout the intermountain West. In 1983, the company applied for and received a Wyoming sales and use tax vendor's license. Between 1997 and 2004, Buehner Block reported Wyoming sales totaling $173,733.87 and remitted Wyoming sales taxes totaling $6,288.51.

[¶ 4]   In 2002, the Wyoming Department of Audit contacted Buehner Block to engage an audit, in part because the audit of one of Buehner Block's customers revealed several invoices where it appeared Buehner Block had failed to collect and remit Wyoming sales tax.  The audit covered the period from July 1, 1999 through December 31, 2002.  A review of about 80,000 invoices revealed 318 instances where Buehner Block delivered product to Wyoming destinations without collecting Wyoming sales tax.[1]  During the audit, Buehner Block did not deny that it arranged for the delivery of its product into Wyoming, that it charged the customer a delivery fee, or that it was making Wyoming sales that required it to collect sales taxes.

[¶ 5]   Later, however, Buehner Block responded to the preliminary audit findings by taking the position that: (1) it was not a vendor as defined by Wyoming law; (2) the sales were made to customers that were not Wyoming based, and it was unable precisely to calculate the tax; and (3) it used a common carrier to deliver the goods after the product was sold at the point of pickup in Utah. The Board did not accept these contentions, concluding instead that Buehner Block's customers received title or possession in Wyoming, and that Buehner Block actually treated the transactions as if they were Wyoming sales.

## THE STATUTORY SCHEME

[¶ 6]   Wyo.   Stat.   Ann.   § 39–15–103(a)(i)(A) (LexisNexis 2005) imposes an excise tax upon "[t]he sales price of every retail sale of tangible personal property within the state."[2]  "Sale" is defined in relevant part as "any transfer of title or possession in this state for a consideration . . . ." Wyo. Stat. Ann. § 39–15–101(a)(vii) (LexisNexis 2005 & Supp.2006).  In turn, the rules of the Wyo-

ming Department of Revenue provide that "[t]he point at which title or possession of tangible personal property passes to the purchaser shall determine the location of the sale."  *Department of Revenue Rules and Regulations,* ch. 2, § 14(p)(i) (2000).  Sales by a vendor are presumed to have occurred within Wyoming unless the vendor retains sale documents showing otherwise:

> Contract of sale, sales invoices, bills of lading or other documentary evidence of the passage of title or delivery of tangible personal property to the purchaser outside this state shall be retained by the vendor to establish the nature of the sale.  If no such evidence is present, it shall be presumed that the sale occurred within the state and the vendor shall be liable for the sales tax thereon.

*Id.* at ch. 2, § 14(p)(iii) (2000).

[¶ 7]   The tax is paid by the purchaser and is collected by the vendor at the time of the sale.  Wyo. Stat. Ann. § 39–15–103(b)(i), (c)(i) (LexisNexis 2005); *Rock Springs Ford Nissan v. State Bd. of Equalization,* 890 P.2d 1100, 1101 (Wyo.1995).  A vendor is "any person engaged in the business of selling at retail or wholesale tangible personal property, admissions or services which are subject to taxation under this article . . . ." Wyo. Stat. Ann. § 39–15–101(a)(xv) (LexisNexis 2005 & Supp.2006).  Every vendor as defined is required to obtain from the Department of Revenue a sales tax license to conduct business in the state, and to remit collected taxes on a monthly basis.  Wyo. Stat. Ann. §§ 39–15–106(a) (LexisNexis 2005), 39–15–107(a)(i) (LexisNexis 2005 & Supp.2006).

[¶ 8]   At issue in the present case is the exemption found in Wyo. Stat. Ann. § 39–15–105(a)(i)(A) (LexisNexis 2001 & Supp.2002):

---

1.   The phrase "Wyoming customers" appears repeatedly throughout the record and the briefs. The audit, however, focused upon sales where the ***destination*** of the goods was within Wyoming, not whether the customer was a ***resident*** of Wyoming.  Buehner Block's customer may or may not have been in Wyoming, and the order may or may not have been placed from within Wyoming.  It was Buehner Block's position that, because all of the orders were received in Utah, and because, according to Buehner Block, title to

the goods passed in Utah, all of its customers were Utah customers.

2.   An "excise" tax is a "tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." *Black's Law Dictionary* 585 (7th ed.1999).  *See also Ludwig v. Harston,* 65 Wyo. 134, 197 P.2d 252, 256 (1948).

(a) The following sales or leases are exempt from the excise tax imposed by this article:

(i) For the purpose of exempting sales of services and tangible personal property which are protected by the United States constitution and the Wyoming constitution, the following are exempt:

(A) Sales which the state of Wyoming is prohibited from taxing under the laws or constitutions of the United States or Wyoming.

## STANDARD OF REVIEW

[¶ 9] Appellate review under W.R.A.P. 12.09 is "limited to a determination of the matters specified in" Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005 & Supp.2006), which provides as follows:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 10] We give deference to the agency's findings of fact, and do not disturb them unless they are contrary to the great weight of the evidence. *EOG Res., Inc. v. Dep't of Revenue*, 2004 WY 35, ¶ 12, 86 P.3d 1280, 1284 (Wyo.2004). Likewise, we do not substitute our judgment for that of the agency if its decision is supported by substantial evidence. *State ex rel. Wyo. Dep't of Revenue v. Union Pac. R.R. Co.*, 2003 WY 54, ¶ 29, 67 P.3d 1176, 1187 (Wyo.2003). We described the substantial evidence test in this context in *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶¶ 12, 22, 49 P.3d 163, 168, 171 (Wyo.2002):

In this jurisdiction, we have described the substantial evidence test in cases where factual findings are challenged as follows:

In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings.... Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

*State ex rel. Wyoming Workers' Safety and Compensation Division v. Jensen*, 2001 WY 51, ¶ 10, 24 P.3d 1133, ¶ 10 (Wyo. 2001) (citations omitted).

[W]e hold the substantial evidence test is the appropriate standard of review in appeals from WAPA contested case proceedings when factual findings are involved and both parties submit evidence.

[¶ 11] As to questions of law, "[o]ur function is to correct any error that an agency makes in its interpretation or application of the law." *EOG Res., Inc.*, 2004 WY 35, ¶ 12, 86 P.3d at 1284. Stated differently, if an agency's conclusions of law are in accordance with the law, we will affirm them. *Wyodak Res. Dev. Corp. v. State Bd. of Equalization*, 9 P.3d 987, 989 (Wyo.2000). An agency's interpretation of statutory language which the agency normally implements is entitled to deference, unless clearly erroneous. *Laramie County Bd. of Equalization v. Wyo. State Bd. of Equalization*, 915 P.2d 1184, 1190 (Wyo.1996); *Mowry v. State ex*

*rel. Wyo. Ret. Bd.,* 866 P.2d 729, 731 (Wyo. 1993).

## DISCUSSION

### *Did the Board err in deciding that these sales were not exempt from Wyoming's sales tax authority under Wyo. Stat. Ann. § 39–15–105(a)(i)(A)?*

[¶ 12] This case involves a fundamental taxing issue—the same issue that was a primary impetus in 1789 when our forebears abandoned the Articles of Confederation in favor of our present constitution. The conflict results from our federal system. The imposition of individual state taxes upon interstate commerce may impede that commerce. On the other hand, if individual states are not permitted to impose any tax upon interstate commerce, interstate commerce does not share in the burden of sustaining the infrastructure necessary for its very existence.[3] Over history, a balance has been struck. Article I, § 8, cl. 3, of the Constitution—the Commerce Clause—authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" As will be seen hereinafter, however, the courts have not interpreted the Commerce Clause as a complete ban upon state taxation of interstate commerce. Instead, tests have been devised to determine what taxes are permitted, thereby allowing state taxation that does not discriminate against interstate commerce.

[¶ 13] The question posed by Buehner Block is whether imposition of Wyoming sales tax upon the sales at issue violates the Commerce Clause. Two United States Supreme Court cases are central to that inquiry. The first of those cases is *National*

*Bellas Hess, Inc. v. Dep't of Revenue of the State of Illinois,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). National Bellas Hess was a Missouri mail order company with no business outlets or sales personnel in Illinois. Bi-annually, it mailed catalogues to customers in Illinois, and flyers occasionally were mailed into that state. Customer orders were received by mail in Missouri, and goods were sent to customers in Illinois only by mail or by common carrier. *Id.,* 386 U.S. at 753–55, 87 S.Ct. at 1389–1390. This conduct was sufficient under the Illinois statutes to constitute National Bellas Hess to be an instate retailer, and to require it to collect and remit Illinois use taxes.[4] *Id.* at 755, 87 S.Ct. at 1390.

[¶ 14] In analyzing the claim of National Bellas Hess that the liabilities imposed by Illinois violated both its due process rights under the Fourteenth Amendment, and the Commerce Clause, the Court said the following:

> These two claims are closely related. For the test whether a particular state exaction is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar. *See Central R. Co. v. Pennsylvania,* 370 U.S. 607, 621–22 [82 S.Ct. 1297, 8 L.Ed.2d 720] [ (1962) ] (concurring opinion of Mr. Justice Black). As to the former, the Court has held that "State taxation falling on interstate commerce . . . can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys." *Freeman v. Hewit,* 329 U.S. 249, 253 [67 S.Ct. 274, 91 L.Ed. 265] [ (1946) ]. And in determining whether

---

3. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 288, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977), provides a quick but detailed analysis of the "perennial problem" of the validity of state taxes that affect interstate commerce. *See also Exxon Corp. v. Wyo. State Bd. of Equalization,* 783 P.2d 685, 689–90 (Wyo.1989); *Frontier Taxidermist v. Wyo. Dep't of Revenue,* 497 P.2d 1374, 1377 (Wyo.1972); *Morrison–Knudson Co. v. State Bd. of Equalization,* 58 Wyo. 500, 135 P.2d 927, 933–34 (1943); and *State Bd. of Equalization v. Blind Bull Coal Co.,* 55 Wyo. 438, 101 P.2d 70, 71–73 (1940).

4. Use taxes often complement sales taxes. A "use tax" is a "tax imposed on the use of certain goods that are bought outside the taxing authority's jurisdiction. Use taxes are designed to discourage the purchase of products that are not subject to the sales tax." *Black's Law Dictionary* 1472 (7th ed.1999). Wyoming's use tax statutes are found at Wyo. Stat. Ann. § 39–16–101 *et seq.* (LexisNexis 2005 & Supp.2006).

a state tax falls within the confines of the Due Process Clause, the Court has said that the "simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444 [61 S.Ct. 246, 85 L.Ed. 267] [(1940)]. The same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales. Here, too, the Constitution requires "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–345 [74 S.Ct. 535, 98 L.Ed. 744] [(1954)].

*Id.*, 386 U.S. at 756, 87 S.Ct. at 1391 (some citations omitted).

[¶ 15] After characterizing this practice as a state "deputiz[ing] an out-of-state retailer as its collection agent," the Court declared that the Commerce Clause did not allow a state to "impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail." *Id.* at 757–58, 87 S.Ct. at 1391–92. Significantly, the Court concluded that, "[i]ndeed, it is difficult to conceive of commercial transactions more exclusively interstate in character than the mail order transactions here involved." *Id.* at 759, 87 S.Ct. at 1392.

[¶ 16] The second and more recent United States Supreme Court case applicable to these issues is *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). Like *National Bellas Hess*, *Quill* involved a state's attempt to require an out-of-state mail-order business to collect use taxes. *Quill*, 504 U.S. at 301, 112 S.Ct. at 1907. The Supreme Court of North Dakota had declined to follow *National Bellas Hess* on the ground that its holding had been made obsolete by intervening social, commercial, economic and legal developments, in particular the remarkable growth of the mail-order business and computer technology. *Id.*, 504 U.S. at 301, 303, 112 S.Ct. at 1907–08.

[¶ 17] The *Quill* court considered both due process and the Commerce Clause in reversing the North Dakota Supreme Court.

As to due process, *Quill* focused upon the requirement that, before a state may tax an entity or transaction, there must be a definite link or minimum connection between the state and the entity or transaction. *Id.*, 504 U.S. at 306, 112 S.Ct. at 1909. The court reiterated its abandonment of formalistic tests based upon presence within a state, in favor of "a more flexible inquiry into whether a defendant's contacts with the forum made it reasonable, in the context of our federal system of Government," to assert jurisdiction over the entity or transaction. *Id.*, 504 U.S. at 307, 112 S.Ct. at 1910. Its reasoning and conclusion, found at *Id.*, 504 U.S. at 307–08, 112 S.Ct. at 1910–11, were as follows:

Applying these principles, we have held that if a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State. As we explained in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 [105 S.Ct. 2174, 85 L.Ed.2d 528] (1985):

"Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.*, at 476 [105 S.Ct. 2174] (emphasis in original).

Comparable reasoning justifies the imposition of the collection duty on a mail-order house that is engaged in continuous and widespread solicitation of business within a State. Such a corporation clearly has "fair warning that [its] activity may

subject [it] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S., [186, 218, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)] (STEVENS, J., concurring in judgment). In "modern commercial life" it matters little that such solicitation is accomplished by a deluge of catalogs rather than a phalanx of drummers: The requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State. Thus, to the extent that our decisions have indicated that the Due Process Clause requires physical presence in a State for the imposition of duty to collect a use tax, we overrule those holdings as superseded by developments in the law of due process.

In this case, there is no question that Quill has purposefully directed its activities at North Dakota residents, that the magnitude of those contacts is more than sufficient for due process purposes, and that the use tax is related to the benefits Quill receives from access to the State. We therefore agree with the North Dakota Supreme Court's conclusion that the Due Process Clause does not bar enforcement of that State's use tax against Quill.

[¶ 18] North Dakota did not fare so well, however, under the Supreme Court's application of the Commerce Clause. The *Quill* court began its analysis of the effect of the Commerce Clause with a reminder that "the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well." *Id.*, 504 U.S. at 309, 112 S.Ct. at 1911 (citing *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 231–32, 239, 6 L.Ed. 23 (1824)). "By its own force," the Commerce Clause "prohibits certain state actions that interfere with interstate commerce." *Id.* (citing *South Carolina State Highway Dep't. v. Barnwell Bros., Inc.*, 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938), *reh'g denied*, 303 U.S. 667). Consistent with these statements, *Quill* revitalized both *National Bellas Hess* and the four-part test of *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977):

While contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today, *Bellas Hess* is not inconsistent with *Complete Auto* and our recent cases. Under *Complete Auto's* four-part test, we will sustain a tax against a Commerce Clause challenge so long as the "tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." 430 U.S., at 279 [97 S.Ct. 1076]. *Bellas Hess* concerns the first of these tests and stands for the proposition that a vendor whose only contacts with the taxing State are by mail or common carrier lacks the "substantial nexus" required by the Commerce Clause.

*Id.*, 504 U.S. at 311, 112 S.Ct. at 1912. The court then went on to distinguish due process analysis from Commerce Clause analysis:

The State of North Dakota relies less on *Complete Auto* and more on the evolution of our due process jurisprudence. The State contends that the nexus requirements imposed by the Due Process and Commerce Clauses are equivalent and that if, as we concluded above, a mail-order house that lacks a physical presence in the taxing State nonetheless satisfies the due process "minimum contacts" test, then that corporation also meets the Commerce Clause "substantial nexus" test. We disagree. Despite the similarity in phrasing, the nexus requirements of the Due Process and Commerce Clauses are not identical. The two standards are animated by different constitutional concerns and policies.

Due process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him. We have, therefore, often identified "notice" or "fair warning" as the analytic touchstone of due process nexus analysis. In contrast, the Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy.

Under the Articles of Confederation, state taxes and duties hindered and suppressed interstate commerce; the Framers intended the Commerce Clause as a cure for these structural ills. See generally The Federalist Nos. 7, 11 (A.Hamilton). It is in this light that we have interpreted the negative implication of the Commerce Clause. Accordingly, we have ruled that that Clause prohibits discrimination against interstate commerce, see, e.g., *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and bars state regulations that unduly burden interstate commerce, see, e.g., *Kassel v. Consolidated Freightways Corp. of Del.*, 450 U.S. 662 [101 S.Ct. 1309, 67 L.Ed.2d 580] (1981).

The *Complete Auto* analysis reflects these concerns about the national economy. The second and third parts of that analysis, which require fair apportionment and non-discrimination, prohibit taxes that pass an unfair share of the tax burden onto interstate commerce. The first and fourth prongs, which require a substantial nexus and a relationship between the tax and state-provided services, limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. Thus, the "substantial nexus" requirement is not, like due process' "minimum contacts" requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce. Accordingly, contrary to the State's suggestion, a corporation may have the "minimum contacts" with a taxing State as required by the Due Process Clause, and yet lack the "substantial nexus" with that State as required by the Commerce Clause.

*Id.*, 504 U.S. at 312–13, 112 S.Ct. at 1913–14 (internal footnotes omitted). The Supreme Court's ultimate conclusion in *Quill* was that the bright-line rule of *National Bellas Hess*—the Commerce Clause prohibits a state from imposing sales or use taxes upon an entity whose only contacts with that state are by mail or common carrier—remains viable. *Id.*, 504 U.S. at 317, 112 S.Ct. at 1915.

[¶ 19] Buehner Block relies heavily upon *National Bellas Hess* and *Quill*. It argues that because it has no physical presence in Wyoming, and its only connection with the State is delivery of goods to Wyoming customers via common carrier, the bright line rule of these cases and the Commerce Clause protect it from Wyoming taxation. In that regard, the State Board concluded that Buehner Block was not so protected because it had not met its burden of proving that its sales personnel no longer traveled in Wyoming, such travel having been asserted in Buehner Block's 1983 application for a Wyoming sales tax vendor license, and more importantly, because Buehner Block voluntarily held a Wyoming sales tax vendor license and collected and remitted Wyoming sales taxes.[5] The State Board's principal conclusion as to the effect of the Commerce Clause is contained in paragraph 60 of its final order:

> 60. We read *Quill Corporation* as extending the Commerce Clause prohibitions principally to those instances in which a state seeks to *impose* a duty on a foreign vendor to collect sales or use taxes, or make the vendor secure a license as a condition of carrying on interstate commerce. *Quill Corporation*, at 315, 112 S.Ct. 1904. Where the vendor proactively seeks a sales tax license, it cannot claim that it has been obliged to assume an unwanted duty. When Buehner Block voluntarily applied for the license, Buehner Block also voluntarily subjected itself to the requirements of the Wyoming sales tax statutes. See *Arrington v. Louisiana State Racing Commission*, 482 So.2d 200, 202 (La.[App.]1986). Where the vendor collects sales tax pursuant to that same license, adherence to the requirements of the state's licensing scheme is merely an adherence to valid conditions and regulations that follow from the voluntary acqui-

---

5. "The burden of proof is upon the party asserting an improper valuation." *Amoco Prod. Co. v. Wyo. State Bd. of Equalization*, 899 P.2d 855, 858 (Wyo.1995); *Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107, 113 (Wyo.1987); *Rules, Wyoming State Board of Equalization*, Chapter 2, § 20.

sition of the license. *See 53 C.J.S. Licenses* § 46. Buehner Block was required as well as authorized to collect taxes on behalf of the State of Wyoming. *Wyo. Stat. Ann.* § *39–15–106(a)*.

[¶ 20] We cannot disagree with the State Board's conclusion as to this limited issue. The question here is not one of due process. Neither is it whether these particular sales were taxable events under the Wyoming sales tax statutes. Rather, the question is simply whether Buehner Block, shipping goods by common carrier, lacked the "substantial nexus" with Wyoming so as to allow this State, in light of the Commerce Clause, to impose its sales tax. We conclude that the bright-line rule of *National Bellas Hess* and *Quill* does not apply here to prohibit imposition of the tax because Buehner Block's connection with Wyoming was substantially more than the shipping of goods by a nonresident seller. For years, Buehner Block voluntarily held a Wyoming sales tax vendor's license and voluntarily collected and remitted Wyoming sales taxes on many other similar transactions.

[¶ 21] The bright-line rule of *National Bellas Hess* and *Quill* does not require physical presence in a state. Rather, the bright-line rule simply holds that, where there is no physical presence in a state, and the only connection between the state and the entity or transaction is by mail or common carrier, there is no "substantial nexus" that will support imposition of a sales or use tax. The requirement of a substantial nexus, rather than the requirement of actual physical presence, necessarily implies that something less than physical presence may suffice. While mail or common carrier delivery, alone, cannot support a state's taxing authority, neither does the existence of either of those factors, *ipso facto*, prohibit the imposition of a tax. Instead, determining the existence or non-existence of "substantial nexus" is a fact-driven inquiry, different in each case. We are satisfied in the instant case that Buehner Block's historical connection with the Wyoming taxing system, including its voluntary possession and use of a Wyoming vendor's license, in combination with common-carrier delivery of its goods into this state, provided that nexus.[6]

### Did the Board err in concluding that these sales were subject to Wyoming's sales tax authority despite the fact that title to the goods passed in Utah where the goods were transferred to a common carrier?

[¶ 22] We have outlined the applicable portion of Wyoming's sales tax statutes hereinabove. Succinctly stated, Wyoming sales tax is due on every sale, with sale defined as "any transfer of title or possession in Wyoming." Wyo. Stat. Ann. § 39–15–101(a)(vii). The complementary administrative rule provides that the location of the sale is determined by the "point at which title or possession" passes to the purchaser. *Department of Revenue Rules and Regulations*, ch. 2, § 14(p)(i) (2000). The present question is whether the sales at issue took place in Utah or in Wyoming.

[¶ 23] Buehner Block's position is that the sales occurred in Utah because (1) all goods were shipped from Utah via common carrier; and (2) all goods were accepted by the carrier via straight bills of lading under which title immediately passed to the buyer. In support of its position, Buehner Block compares itself to the appellant in *Hercules Powder Co. v. State Bd. of Equalization*, 66 Wyo. 268, 208 P.2d 1096, *reh'g denied*, 66 Wyo. 268, 210 P.2d 824 (1949). Hercules Powder was a Delaware corporation, with offices in Salt Lake City, Utah, and Denver, Colorado, and little or no physical presence in Wyoming. *Id.*, 208 P.2d at 1097. As part

---

**6.** The Department and the State Board cite *Arrington v. Louisiana State Racing Comm'n*, 482 So.2d 200, 202 (La.App.1986) for the proposition that the holder of a state-issued license voluntarily subjects himself or herself to that state's authority to the extent of the terms and conditions of the license. Buehner Block cites *Rylander v. Bandag Licensing Corp.*, 18 S.W.3d 296, 298–300 (Tex.App.2000), for the contrary proposition that the mere passive possession of a license to do business in a particular state does not create the substantial nexus sufficient for that state to impose a franchise tax on the licensee. We find that neither case is sufficiently similar to the case *sub judice* to provide much guidance. Neither is a sales or use tax case, where *National Bellas Hess* and *Quill* have created the specialized jurisprudence set forth above.

of its business—the manufacture and sale of "explosives and incidental materials"—Hercules Powder sometimes took mail orders, from inside or outside Wyoming, for its products to be delivered to destination points within Wyoming. *Id.,* 208 P.2d at 1097–1100. This Court concluded that the sales at issue in that case were not subject to the Wyoming sales tax statutes because the straight bills of lading under which the goods were shipped acted to transfer title to the goods to the consignees immediately upon shipment thereunder. *Id.,* 208 P.2d at 1098–1105. *See also Creamery Package Mfg. Co. v. State Bd. of Equalization,* 62 Wyo. 265, 166 P.2d 952, 953, 956–57 (1946); and *Toms v. Whitmore,* 6 Wyo. 220, 44 P. 56, 57 (1896).[7]

[¶ 24] The principal findings of the State Board in regard to this issue are contained in the following paragraphs of its final order:

7. On November 4, 2002, T.R. Lindsay of Audit held an opening conference with Bruce Hiller of Buehner Block. Hiller has been the controller of Buehner Block since 1997. He oversees financial statements, human resources, the general ledger, and credit functions, among other responsibilities. Hiller advised Lindsay that Buehner Block had no Wyoming assets and no Wyoming employees. Hiller also advised Lindsay that Buehner Block's Wyoming sales were designated by a ship-to/delivery location address.

11. During the audit, Hiller confirmed to Lindsay that the ship-to location shown on an invoice reliably indicated the destination of the shipment.

12. At the hearing of this matter, Hiller explained pertinent aspects of Buehner Block's shipping and billing procedures, supported by extensive documentation not made available to the Department until the Friday before the hearing. Generally, Buehner Block's sales manager provides the service of arranging for shipment of products to the customer's destination. Buehner Block shipped to Wyoming customers by common carrier. The carrier picks up the product at Buehner Block's facilities, provides a bill of lading, bills Buehner Block for shipping, and delivers the product. A memorandum of the bill of lading and a copy of the invoice go into a customer file.

13. When Buehner Block shipped by common carrier, it included the carrier's delivery charge on its sales invoice. When Buehner Block collected a sales tax, the tax was calculated on the total of product and delivery charges. Sometimes Buehner Block quoted a single price which included the delivery charge. Buehner Block's computer system assigned the appropriate sales tax based on county of destination.

14. Buehner Block's standard invoice includes the following language on its reverse side:

It is the responsibility of the purchaser to examine and inspect these materials at the point of delivery. If there are any problems Buehner Block Co. must be notified immediately.

\* \* \*

Sellers liability is limited to replacement of the merchandise at no more than the value of the material proven to be defective.

\* \* \*

Our drivers will make reasonable effort to place materials where customer designates, however, in so doing we assume no responsibility for damages inside of curb or property lines.

\* \* \*

Purchaser assumes full responsibility for keeping lime, cement, and related products dry, after he receives possession of these products, i.e.—delivery on job site constitutes possession.

7. A bill of lading is "[a] document of title acknowledging the receipt of goods by a carrier or by the shipper's agent...." *Black's Law Dictionary* 159 (7th ed.1999). A "straight" bill of lading is "[a] nonnegotiable bill of lading that specifies a consignee to whom the carrier is contractually obligated to deliver the goods." *Id.* at 160. The up-to-date and somewhat more complicated definitions of these and related terms as contained in the Uniform Commercial Code can be found at Wyo. Stat. Ann. §§ 34.1-1–201(a) and 34.1-7–102(a) (LexisNexis 2005).

Hiller's testimony was consistent with these terms.

15. On occasions when product suffered damage en route, the freight company paid Buehner Block, not the purchaser, for such damages.

26. Dan Noble testified to the factors that influenced the Department's position regarding its authority to assess the sales tax in dispute. Noble explained that by statute, a sale is a transfer of title or possession for consideration. The Department viewed Buehner Block's sales as destination sales that accordingly occurred in Wyoming. He noted the standard invoice provisions providing for inspection rights, and providing that title passes once the block enters the job site. Noble said his view of title to the goods was reinforced by the fact that any claim for damages in transit was made by Buehner Block against the carrier, implying that the title remained in Buehner Block. His view was further reinforced by the fact that Buehner Block indeed collected sales tax on some Wyoming transactions. The reference on the invoice to "our drivers" is not definitive, but was part of the consideration.

(Internal record references omitted.)

[¶ 25] Based upon these findings, the State Board reached the following conclusion of law:

57. On the facts in the record, the Department properly concluded that the transactions in question met the Wyoming statutory standards for imposition of sales tax. The tax is imposed in retail sales, and a sale occurs when there is transfer of title or possession in Wyoming for consideration. Since Buehner Block's business involved destination sales, the transfer of title and possession occurred in Wyoming even though Buehner Block customarily employed common carriers for delivery.

[¶ 26] It may be helpful, before we analyze these findings and conclusions, briefly to review some mercantile concepts. First, a "destination sale" is one where the seller intends that title or possession of the goods not transfer to the buyer until delivery is made at the designated destination site. *Union Pac. R.R. Co.*, 2003 WY 54, ¶ 26, 67 P.3d at 1186 (Wyo.2003). Second, the effect upon passage of title of a straight bill of lading is not necessarily changed by the parties' additional arrangements concerning the payment of freight charges and assignment of the risk of loss during transit. For instance, we said in *Hercules Powder* that shipment of goods "F.O.B." does not change the general rule of immediate passage of title under a straight bill of lading, unless such intent is clearly shown, the term "F.O.B." being used in such case merely to designate the party who is to pay the freight charges.[8] *Hercules Powder Co.*, 208 P.2d at 1104–05. These cases inform us that the separate questions of passage of title, payment of freight charges, and risk of loss are determined by the intent of the parties, as reflected in the documents used. *See also Buenger v. Pruden*, 713 P.2d 771, 772 (Wyo. 1986); and *S–Creek Ranch v. Monier & Co.*, 509 P.2d 777, 780–81 (Wyo.1973).

[¶ 27] As refined, the question before the Court is whether title or possession of the goods involved in these sales changed hands in Wyoming, making them destination sales taxable in Wyoming, or whether title or possession of the goods changed hands in Utah where the goods were accepted by the common carrier. In reviewing the record to determine whether there was substantial evidence to support the conclusions of the State Board, we note again that Buehner Block bears the burden of proving that the State Board was wrong. *Williams Prod. RMT Co. v. State Dep't of Revenue*, 2005 WY 28, ¶ 7, 107 P.3d 179, 183 (Wyo.2005), *reh'g denied*, No. 04–41 (Mar. 29, 2005).

---

8. "F.O.B." or "free on board" is "[a] mercantile term denoting that the seller is responsible for delivering goods on board a ship or other conveyance for carriage to the consignee at a specified location <FOB Indianapolis plant>. The seller must deliver the goods to the vessel named and has the risk of loss until the goods reach that location." *Black's Law Dictionary* 676 (7th ed.1999). "F.O.B." is defined in Wyoming's Uniform Commercial Code at Wyo. Stat. Ann. § 34.1–2–319(a) (LexisNexis 2005).

[¶ 28] The State Board concluded that the parties intended these to be destination sales. We find there is substantial evidence in the record to sustain that conclusion. That evidence includes these facts: (1) the invoices specified a delivery address in Wyoming; (2) the invoices specified that the goods were to be inspected by the purchaser at the destination point; (3) the invoices specified that "delivery on job site constitutes possession"; (4) Buehner Block collected and remitted Wyoming sales taxes on many similar transactions; (5) Buehner Block did not collect and remit Utah sales taxes on these transactions; (6) when Buehner Block did not collect and remit Wyoming sales taxes on Wyoming destination sales, it was because Buehner Block mistakenly collected and remitted taxes for another state, such as Idaho, or because Buehner Block mistakenly believed at the time that the transaction was "government exempt"; (7) Buehner Block collected and remitted sales taxes for similar transactions in Idaho and Nevada; and (8) Buehner Block voluntarily held and used a Wyoming sales tax vendor's license.

[¶ 29] There is, of course, evidence in the record to the contrary. For instance, numerous straight bills of lading were placed into evidence. And Buehner Block's controller testified that he believed the customer "was responsible for" the product once it was loaded by a common carrier. Where the evidence is in dispute, we do not, however, substitute our judgment for that of the State Board, so long as there is substantial evidence to support the State Board's conclusions. *Union Pac. R.R. Co.*, 2003 WY 54, ¶¶ 28–29, 67 P.3d at 1186–87.

### Did the Board err in any event in failing to give Buehner Block a claimed credit?

[¶ 30] During the hearing before the State Board, Buehner Block sought a credit against any assessment that might be imposed, based upon certain transactions with Tensar Corporation.[9] Buehner Block's controller described the underlying facts as follows: Buehner Block sold over $300,000 worth of concrete block to Tensar Corporation for a Wyoming Department of Transportation job at Alpine Junction. The two companies got into a dispute over whether or not the block met specifications and, eventually, Buehner Block ended up giving Tensar Corporation a $122,621.12 credit against amounts due on the project. This credit was not reflected in the audit because it was not contained in the regular invoices reviewed by the auditor. Instead, it had been computed on a spreadsheet, with the information later transferred to a separate credit invoice. That credit invoice was prepared in 2002 or 2003, but was manually dated June 1, 2001. The State's auditor testified that, had the credit been given, the tax assessment would have been approximately $5,000 less.

[¶ 31] The State Board's findings concerning the Tensar Corporation credit were as follows:

27. The Department's assessment rested principally on sales to four contractors: McQueen Masonry, Tensar, Pete Mickelsen & Sons, and M–L Masonry. Following the issuance of the preliminary audit findings, Buehner Block began to produce documents related to these four contractors. However, Buehner Block did not call any witnesses from any of the four contractors to testify at the hearing of this matter.

28. All of the documents produced after the audit relate to claims that Buehner Block did not have to pay taxes on transactions involving the four contractors. Generally speaking, the principal auditor testified that if he had seen these documents during the audit, he would have conducted further investigation before drawing any conclusions.

39. Exhibit 115 is an invoice reflecting a credit of $122,621.12 to Tensar because the block provided by Petitioner failed to meet specifications. Tensar had previously made partial payments on the job when Buehner Block originally issued invoices in 1999.

---

9. Tensar Corporation is identified as "Tesnar Earth Tech" in the Department's brief. All exhibits, the hearing transcript, and the State Board's final order refer to "Tensar Corporation." We will use that name.

40. Although the invoice is dated June 1, 2001, Bruce Hiller testified that the date was entered manually, and "it was done after the audit period because we hadn't settled everything up." On its face, the invoice has a telefax date of March 12, 2003. Hiller conceded the credit was granted no earlier than late 2002, and may have been in 2003. The invoice was not given to the auditor, from which we infer that it was not available.

41. Dan Noble explained that in the instance of a rescinded sale, the vendor can either request a refund or take a credit on a subsequent sales tax return. Either way, the change in the transaction is not reflected until it actually occurs.

42. We find that Buehner Block did not carry its burden of persuasion to demonstrate that the Tensar credit was issued during the audit period. Our finding in no way precludes Buehner Block from pursuing a refund request as authorized by statute; we only find that the credit did not affect the audit assessment.

(Internal record references omitted.)

[¶ 32] Those findings of fact led the State Board to the following conclusion of law:

65. We also conclude that Buehner Block failed to provide sufficient evidence to support its claim that the Tensar credit of $122,621.12 applied to the audit period in question.

[¶ 33] The substance of the State Board's conclusion is simply that Buehner Block did not prove that the Tensar Corporation credit actually was given during the period audited, that being July 1, 1999 through June 30, 2002. The record evidence is sufficiently cloudy in that regard that we cannot disagree. There is no question that neither the initial spreadsheet, nor the credit invoice, were made available to the State's auditors, and the spreadsheet was not entered into evidence. One reasonable inference from those facts is that the credit invoice did not exist at the time of the audit, and we cannot fault the State Board for making that inference. Furthermore, inasmuch as the State Board's order did not determine the merits of the credit itself, neither does this Court,

and Buehner Block is free to pursue a refund or credit.

## CONCLUSIONS

[¶ 34] The sales at issue in this case were Wyoming destination sales, subject to the Wyoming sales tax scheme. Application of that tax scheme to these sales did not violate the Commerce Clause of the United States Constitution because Buehner Block had a substantial nexus with this State, and there was no showing that the tax was unfairly apportioned, was not related to the services provided by Wyoming, or discriminated against interstate commerce.

[¶ 35] We affirm the decision of the Wyoming State Board of Equalization.