2010 WY 41

NORTHFORK CITIZENS FOR RESPON-SIBLE DEVELOPMENT, David Jami-son, an individual, and Robert Hoszwa, an individual, Appellants (Petitioners),

v.

BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY, Appellee Respondent,

and

Worthington Group of Wyoming, LLC, Appellee (Respondent–Intervenor).

Worthington Group of Wyoming, LLC, Appellant (Respondent–Intervenor),

v.

Board of County Commissioners of Park County, Appellee (Respondent),

and

Northfork Citizens for Responsible Devel-opment, David Jamison, an individual, and Robert Hoszwa, an individual, Ap-pellees (Petitioners).

Nos. S–09–0148, S–09–0149.

Supreme Court of Wyoming.

April 8, 2010.

Representing Northfork Citizens for Responsible Development, David Jamison, and Robert Hoszwa: Debra J. Wendtland and Anthony T. Wendtland of Wendtland & Wendtland, LLP, Sheridan, Wyoming. Argument by Ms. Wendtland.

Representing Board of County Commissioners of Park County: James F. Davis, Deputy Park County Attorney, Cody, Wyoming.

Representing Worthington Group of Wyoming, LLC: Laurence W. Stinson and Dawn R. Scott of Bonner Stinson, P.C., Cody, Wyoming. Argument by Mr. Stinson.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] Northfork Citizens for Responsible Development, David Jamison, and Robert Hoszwa (collectively Northfork) have appealed the district court's affirmance of the approval by the Board of County Commissioners of Park County (the Board) of a subdivision proposed by Worthington Group of Wyoming, LLC (Worthington).[1] Northfork raises evidentiary and procedural issues. In a cross-appeal, Worthington contends that Northfork's issues are moot because Worthington has built the subdivision. We find that the appeal is not moot. We affirm in part and reverse in part, and remand to the district court for further remand to the Board for proceedings consistent with this opinion.

## ISSUES

[¶ 2] 1. Are Northfork's issues moot because, Northfork having sought neither a stay nor an injunction, Worthington built the subdivision while the appeal was pending?

2. Did the Board violate county regulations and state law by allowing county officials to waive mandated collection of information at an early stage of development on the ground that such information would be collected at a later stage?

3. Did the Board violate county regulations by approving a final plat that was not consistent with the sketch plan?

4. Is the Board's finding that the subdivision has a dependable water source supported by substantial evidence?

5. Did the Board's approval of the subdivision's open space plan violate county regulations?

6. Was Northfork unlawfully denied intervention in the contested case hearing?

7. Did the Board violate county regulations by allowing dedication of subdivision roads for only limited public use?

8. Did the Board violate county regulations and state law by allowing gated access to the subdivision?

9. Did the Board violate county regulations by allowing multi-family dwellings on a portion of the subdivision?

## FACTS

[¶ 3] In Park County, the developer of a proposed subdivision must obtain sketch plan approval, final plat approval, and a special use permit. At issue in the instant case is the Board's application of that process and its eventual approval of the Copperleaf Subdivision (the subdivision), which is located on approximately 553 acres of land along the North Fork of the Shoshone River, west of Cody. In *Northfork Citizens for Responsible Development v. Park County Board of County Commissioners*, 2008 WY 88, ¶ 16, 189 P.3d 260, 264–65 (Wyo.2008) (*Northfork I*), this Court determined that the Northfork group, who are neighboring or area landowners, had standing to petition for judicial review of the Board's approval of the

---

1. Over time, the legal identities of the developer and the contestants have changed somewhat, but those changes are not relevant to the issues involved herein. Consequently, we will refer to the former as "Worthington" and the latter as "Northfork" throughout this opinion.

subdivision. Upon remand, the district court affirmed the Board. These inter-related appeals followed.

[¶4] In October 2004, Worthington submitted to the Park County Planning & Zoning Commission (the Commission) and the Board a sketch plan and special use permit application for development of the subdivision. Northfork filed numerous written objections and appeared at all Commission hearings regarding the project. The Commission held a public hearing on November 30, 2004, at which hearing Worthington agreed to change its proposed water source from individual wells to a centralized system. On December 8, 2004, the Board denied Northfork's attempted appeal of various "determinations and/or interpretations" made by the planning coordinator in his review of the sketch plan and special use permit application. In addition to finding, in effect, that the appeal was premature, the Board specifically stated the following:

 . . . .

WHEREAS, evidence of adequate capacity for water and sewer is necessary between the sketch plan and final plat stage in the review process for approval or denial of a subdivision, but is not necessary at the sketch plan/special use permit stage during concurrent review; and

WHEREAS, the [Commission] and the [Board] will have the ability to review the adequacy of water and sewer capacity as is required by both the [zoning regulations] and [development standards and regulations], as well as the other items listed in the written letter of appeal during the normal process of the subdivision/special use permit review; and

WHEREAS, at the sketch plan/special use permit stage, under circumstances where the applicant has sought concurrent review of the sketch plan and special use permit application, the Planning Coordinator may waive items of information listed as required;

 . . . .

[¶5] The Commission held a second public hearing on December 21, 2004, to continue discussing both the sketch plan and the special use permit application. On the same date, the Commission approved the sketch plan and recommended approval of the special use permit, conditioned to ensure that "[a]dequate services and infrastructure are available to serve the use, or the applicant has agreed to provide services and infrastructure in sufficient time to serve the proposed use[.]"

[¶6] On December 28, 2004, Northfork appealed the Commission's resolution, raising many of the issues presently before the Court in this appeal, including procedural defects, insufficient information in the application, gated access, road dedication, open space requirements, multi-family dwellings, and water and sewer systems. The Board denied the appeal as it applied to the special use permit, finding that no such appeal right existed, but agreed to hear the appeal as it applied to sketch plan issues. The Board conducted a public hearing on January 25, 2005, and on February 8, 2005 issued a resolution in which it found against Northfork on some issues, found that some issues were not ripe for appeal because they were not sketch-plan issues—this category including water and sewer services—and remanded some issues to the Commission for further consideration—this category including open space requirements. Of special significance to the present appeal is the Board's interpretation of its subdivision regulations as not requiring certain sketch plan information in the context of a major subdivision development, because such information is to be provided at the final plat stage.

[¶7] The Commission held a public meeting on March 15, 2005, to consider the matters remanded to it by the Board. As concerns this appeal, the Commission thereafter issued Resolution No. 2005–13, in which a "Revised Sketch Plan" with re-drawn open space boundaries was approved. The new open space plan consisted of connecting previously separate open space parcels with "corridors" dedicated as open space. Northfork's appeal of this resolution was denied by the Board on April 19, 2005, on the ground that the resolution involved only ministerial acts that remained subject to Board review.

[¶ 8]   On March 31, 2005, the Board held a public hearing on Worthington's special use permit application.  For the next couple of months Worthington and Northfork dueled over the water supply issue, eventually drawing both the State Engineer's Office and the Department of Environmental Quality (DEQ) into the fray.  The details of that conflict will be discussed in more detail in the section of this opinion dealing with substantial evidence as to the water source.  Suffice it to say for present purposes that, when the Board approved the special use permit via its Resolution No. 2005–40 on June 21, 2005, it did so based upon Worthington's agreement to provide "service and infrastructure in time to serve the proposed use."

[¶ 9]   Not surprisingly, the water supply issue survived approval of the special use permit, with Worthington identifying and then abandoning various water sources.  On October 28, 2005, DEQ issued a "no adverse recommendations" letter based upon a proposed public water supply system using water taken from the North Fork of the Shoshone River, with a permit for 200 gallons per minute.  Two months later, on December 28, 2005, Worthington filed the final plat for the subdivision.

[¶ 10]   The Board discussed and voted to approve the final plat at a regularly scheduled meeting on March 7, 2006.  Resolution No. 2006–16, carrying that vote into effect, was issued on March 14, 2006.  The Resolution contained the following lengthy finding in regard to the subdivision's water supply:

> The Board finds that DEQ, in consultation with the Wyoming State Engineer has reviewed the Developer's plan for a central water distribution system drawing water from the Northfork of the Shoshone River under a water permit issued by the Wyoming State Engineer in May 2005 for year-round direct flow in the amount of 200 gallons per minute, and that the subdivision at full build-out (131 lots) will not require said amount of water according to calculations in the file and otherwise of record undisputed by any other calculations of record, and that the Developer has provided information in the file that, after checking with the State Engineer, there

has been no recorded regulation or "call" on water rights on the Northfork of the Shoshone River, however, opponents to this subdivision have submitted pleadings from a separate proceeding indicating that in 1977 there was a "call" on the Northfork of the Shoshone River during a dry year, however, the Board herein takes notice that in 1993 the Bureau of Reclamation completed a project on the Buffalo Bill Dam and Reservoir which has allowed for significantly more water storage in Buffalo Bill Reservoir than existed in 1977 and that such additional storage creates significantly different and more favorable circumstances relating to satisfaction of water rights than existed in 1977, including the availability of water in a State of Wyoming storage account available for purchase and/or exchange; and that DEQ, after reviewing the Developer's water system plan as required by law and pursuant to their own rules and regulations has provided the Board with a letter with no adverse recommendations regarding the water supply system and that said review requires a demonstration of quantity, quality and dependability of the water supply system and that said review satisfactorily accomplishes the purposes of the Park County subdivision regulations, and that even so the Board has reviewed the information presented itself, and finds that, the water system as reviewed herein is dependent solely on the May 2005 water permit and that the Board is not in its review considering the availability of domestic water from any wells located on the subject property or from irrigation rights or other source, though the Board recognizes that the Developer does have potential access to additional water for domestic purposes should the Developer seek to follow whatever necessary local, state and/or federal procedures exist in supplementing its 2005 direct flow water permit; and that the system provides that all water mains are within the boundaries of the subdivision and that individual service lines are available to each lot line[.]

[¶ 11]   On March 30, 2006, Worthington requested a contested case hearing (the hearing) to challenge five conditions the Board

had placed upon the subdivision: (1) dedication of subdivision roads to public use; (2) no multi-family dwellings; (3) no gated entrance; (4) no planting of fruit- or berry-producing trees; and (5) no stocking of fish in ponds.[2] Alleging to be "aggrieved or adversely affected in fact" by the Board's decisions, Northfork reacted by moving the Board to be allowed to intervene in the hearing procedures, including discovery, as a matter of right. The Board responded by requiring Northfork first to "demonstrate with specificity" the following:

i. Their individual or collective ability to meaningfully contribute to the record in this matter in a manner which will [not] cause undue delay or prejudice to one or both current parties;

ii. The nature and extent of harm they may collectively or individually suffer as it relates to each specific issue raised in the Worthington Group's contested case petition;

iii. How the proposed interveners are collectively or individually so situated that the disposition of this contested case may, as a practical matter impair or impede the proposed interveners' collective or individual ability to protect their respective interests;

iv. How the proposed interveners either collectively or individually allege their interests are not or will not adequately be represented by Park County and the Park County attorney; and

v. That they have a significant interest in the present contested case proceeding, and not one that is merely contingent or similar to the interest of any member of the public at large.

vi. The names or identities of the individual members of North Fork Citizens for Responsible Development; the ownership interest in any real properties or other assets that such members deem may be affected by the Copperleaf Subdivision Development; and a specific description of the existence of North Fork Citizens for Re-

sponsible Development as a legal entity, including its formation date.

[¶ 12] While maintaining its objection to these special requirements, Northfork submitted responses, in which it emphasized the special harm to neighboring landowners and downstream water users that could result from approval of the subdivision. In a lengthy and detailed order, the Board denied Northfork's motion to intervene, concluding that Northfork had failed to provide sufficient information showing that individual Northfork members would be harmed by the subdivision to any greater extent than would be the general public.

[¶ 13] The contested case hearing was held on July 12, 2006, and the Board issued its findings of fact and conclusions of law on October 3, 2006. In its order, the Board continued the prohibition against fruit- and berry-producing trees, and the prohibition against fish in the ponds, but reversed itself on the other issues: allowing limited dedication of roads to public use, allowing a gated entrance, and allowing multi-family dwellings on a portion of the platted area. Northfork filed a petition for review in the district court on November 1, 2006, challenging (1) Resolution No. 2005–40, which approved the special use permit; (2) Resolution No. 2005–53, which clarified the intention of Resolution No. 2005–40 in regard to the timing of water system and sewer system approvals; (3) Resolution No. 2006–16, which approved the subdivision permit and final plat; and (4) the Board's findings of fact and conclusions of law resulting from the hearing. Worthington was allowed to intervene in the court action to protect its interests.

[¶ 14] On May 18, 2007, Worthington moved to dismiss the petition for review on the ground that Northfork was not aggrieved or adversely affected in fact by the Board's action. The district court issued a decision letter on July 23, 2007, and an order of dismissal on August 23, 2007, in which it concluded that the Northfork appellants lacked standing to challenge the Board's actions because they had not shown that they

---

**2.** The last two listed conditions were imposed to discourage the entry of bears into the subdivision.

possessed any interest in the matter different from that of members of the general public. As noted previously herein, Northfork appealed that ruling, and we reversed in *Northfork I.* Upon remand, the district court eventually made the following determinations: (1) Worthington's completion of the project did not render the matter moot because the Wyoming Rules of Civil Procedure did not require Northfork to obtain an injunction; (2) the Board's ratification in Resolution No. 2005–40 of the planning coordinator's waiver of water supply information at the special use permit stage did not violate county regulations; (3) the Board's decisions during the special use permit review process regarding water supply were supported by substantial evidence; (4) the Board's findings in regard to the open space requirements of a "grouped lot subdivision with density bonus" were supported by substantial evidence; (5) Resolution No. 2006–16 is not clearly contrary to the overwhelming weight of the evidence in regard to water supply; (6) the Board's adoption of Resolution No. 2006–16 as it relates to water supply was not arbitrary or capricious, and was in accordance with the law; (7) Resolution No. 2006–16 did not violate the county's open space regulations; (8) the Board did not err in denying Northfork's motion to intervene in the contested case hearing process because the Board, as a party, sufficiently represented Northfork's interests; (9) while there is a county regulation that subdivision roads be "offered" for public dedication, there is no county regulation that requires the Board to accept all offered roads as fully dedicated to public use; (10) inasmuch as subdivision roads need not be accepted for public use and maintenance, it follows that allowing a gated entrance to a subdivision that does not have roads fully dedicated to public use is not a violation of state law in the form of a county sub-delegating the regulation of traffic; and (11) the Board did not err in determining that an earlier variance allowing multi-family dwellings on a portion of the platted area had not expired.

[¶ 15] The combined cases now before this Court consist of Worthington's appeal of the district court's rejection of its mootness argument, and Northfork's appeal from the rest of the district court's order and the underlying Board decisions.

## STANDARD OF REVIEW

[¶ 16] A district court's decision on the question of mootness is an issue of law that we review *de novo. Cooper v. Town of Pinedale*, 1 P.3d 1197, 1201 (Wyo.2000). The other issues brought to the Court in this appeal require application of our standard for reviewing the actions of an administrative agency. That standard requires that we give no special deference to the decision of the district court, but consider the case as if it came directly from the agency. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 9, 188 P.3d 554, 557 (Wyo.2008). The statutory limits of our review are set forth in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009):

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 17] In *Dale*, we noted that this statute actually contains several different standards

of review, and that all are not applicable in any given instance. 2008 WY 84, ¶¶ 8–26, 188 P.3d at 557–62. We will not repeat that detailed analysis here. Rather, we will simply parse the statute and note that a reviewing court must set aside agency action where the agency: (1) acted arbitrarily; (2) acted capriciously; (3) acted contrary to law; (4) abused its discretion; (5) violated a constitution; (6) acted beyond its statutory authority; (7) failed to observe legally required procedures; or (8) made findings or reached conclusions unsupported by substantial evidence. We have defined "arbitrary and capricious" in the administrative agency review context as follows:

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Id.* at ¶ 12, at 559 (internal citations and quotation marks omitted). In turn, we defined the substantial evidence test as follows:

> "In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions...."

*Id.* at ¶ 11, at 558 (quoting *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2002 WY 91, ¶ 12, 49 P.3d 163, 168 (Wyo. 2002)).

## DISCUSSION

### *Are Northfork's issues moot because, Northfork having sought neither a stay nor an injunction, Worthington built the subdivision while the appeal was pending?*

[¶ 18] The doctrine of mootness has clear application in Wyoming:

We have examined the mootness doctrine on numerous occasions. In *Bard Ranch Co. v. Frederick,* 950 P.2d 564, 566 (Wyo.1997), we said:

> Our general law on justiciability provides that courts should not consider issues which have become moot. We do not decide cases when a decision will have no effect or pertains only to matters that might arise in the future. A case is moot when the determination of an issue is sought which, if provided, will have no practical effect on the existing controversy. Therefore, if events occur during the pendency of an appeal that cause a case to become moot or make determination of the issues unnecessary, we will dismiss it.

*In re SNK,* 2005 WY 30, ¶ 6, 108 P.3d 836, 837–38 (Wyo.2005) (most internal citations omitted). Of particular import to the instant case is the idea that the interests supporting standing may not necessarily persist throughout litigation:

> The doctrine of mootness encompasses those circumstances which destroy a previously justiciable controversy. This doctrine represents the time element of standing by requiring that the interests of the parties which were originally sufficient to confer standing persist throughout the duration of the suit. Thus, the central question in a mootness case is "whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties."

*Merchant v. State Dep't of Corrs.,* 2007 WY 159, ¶ 15, 168 P.3d 856, 863 (Wyo.2007) (quoting *KO v. LDH (In re Guardianship of MEO),* 2006 WY 87, ¶ 27, 138 P.3d 1145, 1153 (Wyo.2006) (internal citations omitted)).

[¶ 19] Worthington's mootness argument is as follows: when Northfork filed its petition for review in the district court in November 2006, it sought neither a stay, nor an

injunction.[3] Consequently, nothing prevented Worthington from completing the subdivision, which it did. In its brief, Worthington describes the now-existing situation as follows:

> In asking the Court to review and overturn or remand the permits issued by [the Board], [Northfork] asks the Court to "undo" all the building and infrastructure that has been completed. To honor their request would necessarily impose tremendous hardship on the developers, residents, and purchasers. The relief sought by [Northfork]—no more [subdivision]—can only be obtained at significant hardship to others. At the time the lower court heard the appeal, [the subdivision] was (and remains) complete. Thirty-two home sites have been sold and 2 homes were currently under construction. Mr. Kudelski, one of the owners of the development company, uncontestedly points out that:

> > In other words, the roads, potable water system, centralized sewer system, raw water system, electric and power infrastructure, and phone lines have all been installed and are currently being used. The landscaping has been completed and is quite extensive, including on-site ponds, berms, fencing, and the like. The gatehouse and gates have also been constructed, as has an entry way statue of elk in combat.

[¶ 20] Worthington relies upon the legal and equitable principles set forth in *Zoning Bd. of Adjustment v. DeVilbiss*, 729 P.2d 353 (Colo.1986). The facts of that case are not complex. DeVilbiss, a neighboring landowner, contested a coal company's application for a special use permit to construct a coal-loading facility. The special use permit was granted, contingent upon the company's obtaining a height variance. The variance was also granted. DeVilbiss filed suit, alleging arbitrary and capricious agency action. Eventually, the Colorado Supreme Court found the matter to be moot because the facility had been constructed during the pen-

dency of the action, and DeVilbiss had not sought a stay or preliminary injunction. *Id.* at 356–60. The Colorado court reasoned that: (1) a party who seeks to enjoin presumptively legal conduct, but who fails to seek a stay or a preliminary injunction, "must bear some responsibility for" the changed circumstances; (2) courts are more apt to find mootness from changed circumstances where the challenged conduct is legally permissible and done in good faith; and (3) the company had spent a large sum of money in completing the facility. *Id.; see also Richland Park Homeowners Ass'n v. Pierce*, 671 F.2d 935, 938 (5th Cir.1982).[4]

[¶ 21] In response, Northfork contends that, in *Ebzery v. City of Sheridan*, 982 P.2d 1251 (Wyo.1999), this Court rejected the reasoning of *DeVilbiss* and also rejected application of the theory of "vested rights" in situations such as the one at hand. Although *Ebzery* involved a variance rather than a special use permit, we observed that "[a]ctions taken in reliance on a variance or permit while the time for appeal is pending are inherently unreasonable." *Id.* at 1257. In holding that the developer's expenditures did not render the underlying issues moot, we described such expenditures as a "calculated risk." *Id.* at 1256–57. Finally, we specifically recognized the vested rights doctrine described in *Snake River Venture v. Board of County Commissioners*, 616 P.2d 744 (Wyo. 1980), but we opined that "*Snake River* does not stand for the proposition that one who knows a variance is subject to appeal may render that appeal moot if only [he or she] act[s] quickly enough." *Ebzery*, 982 P.2d at 1257.

[¶ 22] We do not believe that the distinction between a variance and a special use permit negates the application of the principles enunciated in *Ebzery* to the present case. Perhaps most importantly, those principles require parties to respect the judicial process and judicial resolution of disputes:

---

3. See W.R.C.P. 62 and 65.

4. The rationale of *DeVilbiss*—that a change in circumstances may render an existing controver-

sy moot—was reaffirmed in *Grange Insurance Association v. Hoehne*, 56 P.3d 111, 114 (Colo.Ct. App.2002).

[W]e are not unmindful of *Zoning Bd. of Adjustment v. DeVilbiss,* 729 P.2d 353 (Colo.1986), which holds that the failure of one challenging a zoning variance to obtain a temporary injunction pending the outcome of an appeal renders the cause moot. The problem with this approach, however, is that it encourages the disregard of legal challenges and promotes construction which may subsequently be found to be in violation of an erroneously waived zoning regulation. In this regard, we consider the reasoning in *Bat'tles v. Board of Adjustment and Appeals,* 711 S.W.2d 297 (Tex.App.1986), to be sounder. The *Bat'tles* court rejected the notion that the failure to obtain a restraining order or to file a supersedeas bond renders the cause moot. That court concluded that as the statute concerning the grant or denial of a variance was silent on whether a bond or restraining order was required, the general law of civil suits applied, and that law does not require a losing plaintiff to seek a bond or a restraining order.

We therefore reject the *DeVilbiss* approach and hold that just as a plaintiff who collects a judgment which is appealed but is not superseded takes the risk of having to make restitution, *Ohio Cas. Ins. Co. v. Gantt,* 256 Ala. 262, 54 So.2d 595 (1951), so, too, does one who builds in accordance with a zoning variance which is appealed take the risk that it will have to tear down what it has built.

*Bowman v. City of York,* 240 Neb. 201, 482 N.W.2d 537, 546 (1992). Expenditures made with knowledge of a court challenge are not expenditures made in good faith reliance upon a variance or permit. *Id.* at 547. We continue to hold that, in Wyoming, completion of a project under a variance or permit during the pendency of an appeal does not render the appellate issues moot.

**Did the Board violate county regulations and state law by allowing county officials to waive mandated collection of information at an early stage of development on the ground that such information would be collected at a later stage?**

■ [¶ 23] The gravamen of this allegation is that the Board violated state law by not complying strictly with its own zoning regulations, which failure requires reversal of the Board's actions.[5] Specifically, Northfork contends that the Board allowed Park County's planning coordinator to violate his authority to waive certain information requirements under Zoning Regulation 4–510 by allowing Worthington to apply for a special use permit without providing the water system information mandated by Zoning Regulation 4–505 and 4–510. Zoning Regulation 4–505 reads as follows:

Special use permit approval is required before commencing or establishing any use specified in Table 2–1, *Schedule of Uses,* as requiring a special use permit. Special use permits are also required pursuant to Subsection 3–210–E, *Nonconforming Uses,* and Division 6–300, *Airport Overlay District.*

Subdivisions are specified in Table 2–1, and therefore require a special use permit. In turn, Zoning Regulation 4–510 provides in pertinent part as follows:

The following information shall be submitted to the Planning Department with any application for a special use permit unless the Planning Coordinator waives information requirements because the specified item(s) is not relevant to the project review.

A. **Written Material:**

. . . .

5. Evidence that an adequate water supply in terms of quantity, quality, and

---

**5.** Northfork cites *Ahearn v. Town of Wheatland,* 2002 WY 12, ¶ 14, 39 P.3d 409, 415 (Wyo.2002), and *Schoeller v. Board of County Commissioners of the County of Park,* 568 P.2d 869, 876–77 (Wyo.1977) in support of this proposition. Those cases actually hold that the zoning authority of counties and municipalities is limited to that derived from state statute, and county actions inconsistent with the statutes may mandate re-

versal. Similarly, two cases cited by Northfork as holding that "[c]ounty planning regulations must be strictly construed and followed" do not involve county planning or zoning regulations. *See Amoco Prod. Co. v. Dep't of Revenue,* 2004 WY 89, ¶¶ 19–21, 94 P.3d 430, 439 (Wyo.2004); and *U.S. West Commc'ns, Inc. v. Wyo. Public Serv. Comm'n,* 988 P.2d 1061, 1067 (Wyo.1999).

dependability for the use is or will be available;

. . . .

(Emphasis in original.)

[¶ 24] Northfork posits that a general waiver provision that allows the planning coordinator to waive the production of information "not relevant to the project review" simply cannot be extended so far as to relieve a developer from the duty of producing before approval of a special use permit application, information concerning the water source and supply for a major subdivision. Consequently, Northfork argues, the Board violated its own zoning regulations when it adopted Resolution No. 2005–40 on June 21, 2005, approving the special use permit for the subdivision, while having in hand only Worthington's agreement "to provide service and infrastructure in time to serve the proposed use," as opposed to actual information showing "an adequate water supply in terms of quantity, quality, and dependability."

[¶ 25] The Board's response to the accusation that it did not follow its own rules focuses upon the distinction between an application solely for a special use permit, and an application for a special use permit coupled with an application for a subdivision permit. As an example of the former, the Board states that a person desiring to establish a commercial business on his or her property would be required only to apply for a special use permit. All use impacts would be reviewed prior to approval of a special use permit in that situation because that would be the extent of county review.

[¶ 26] In the subdivision context, however, the developer is required to proceed through a three-step process. First, the subdivision is exposed to "sketch plan review" by the Commission. Second, as noted above, subdivision approval also requires special use permit application and approval. Finally, "final plat review" occurs prior to the Board's approval of a subdivision. The Board's point is that the planning coordinator's waiver of the presentment of certain information at one stage of the proceedings is acceptable where the information must be presented at a different stage of the proceedings prior to final approval. The Board further points out

that, in addition to the waiver authority found in Zoning Regulation 4–510, set forth above (*see supra* ¶ 23), Park County's Development Standards and Regulations give the planning coordinator similar authority:

These standards and regulations specify information to be submitted with permits, certificates, and other applications. Situations may occur when not all of the items listed will be needed because of the nature of the applicant's request. . . . The Planning Coordinator and/or County Engineer are hereby authorized to determine, based on the nature of the applicant's request, whether to waive the requirement to submit items of information or to require additional information.

[¶ 27] "Administrative rules and regulations have the force and effect of law, and an administrative agency must follow its own rules and regulations or face reversal of its action." *RME Petroleum Co. v. Wyo. Dep't of Revenue*, 2007 WY 16, ¶ 40, 150 P.3d 673, 688 (Wyo.2007); *see also In re Adoption of CF*, 2005 WY 118, ¶ 42, 120 P.3d 992, 1005 (Wyo.2005). In assessing whether an agency has abided by its rules and regulations, we defer to the agency's construction of those rules and regulations, unless that construction is clearly erroneous or inconsistent with their plain meaning. *RME Petroleum*, 2007 WY 16, ¶ 44, 150 P.3d at 689; *Swift v. Sublette County Bd. of County Comm'rs*, 2002 WY 32, ¶ 10, 40 P.3d 1235, 1238 (Wyo.2002); *Pinther v. State Dep't of Admin. & Info.*, 866 P.2d 1300, 1302 (Wyo.1994).

[¶ 28] In the instant case, the Board has concluded that its rules and regulations allow it to schedule over time the receipt from a developer of information required in the sketch plan-special use permit-final plat-subdivision plan approval process. That conclusion, based upon the interrelatedness of the separate processes, is not clearly erroneous, nor is it inconsistent with the plain meaning of the rules and regulations, when all are read together. The subdivision approval process is time-consuming and in-depth. It involves numerous decisions, on many and various issues, and it involves continual and repeated status review by county staff members, the Commission, and the Board. It is

not unreasonable for the Board to determine that certain information, such as water source information, that might be required at an earlier stage in a simpler development, need not be provided until a later stage in a complex subdivision development. This is not a case where the Board granted a subdivision permit without requiring mandatory submissions of information; rather, it is simply a case where the Board accepted submission of that information in a timely manner as the subdivision application progressed.

### Did the Board violate county regulations by approving a final plat that was not consistent with the sketch plan?

[¶ 29] Northfork contends that, in violation of Park County's Development Standards and Regulations, the subdivision's final plat was not consistent with its sketch plan. Because Northfork's argument in this regard is brief, it is easier simply to quote it rather than to paraphrase:

One criteria [sic] for approval of a final plat is that the final plat "must" be "consistent with the approved sketch plan...." DSR Ch IV § 3. b. (3). Resolution No. 2006–16 is not consistent with the approved sketch plan. Prior to and during the sketch plan phase, [Worthington] repeatedly changed it's [sic] water source for the subdivision. Finally, after proposing to convert irrigation water to domestic use, the Park County Planning Coordinator proclaimed that [Worthington's] plan to convert irrigation water to domestic use was now "elemental" to the sketch plan. Completely contrary to that "elemental" plan, the final plat relies upon 2005 surface water from the river. Again, completely contrary to the mandate of DSR IV § 3 b. (3) the court below allowed the [Board] to waive the consistency requirement as to water.

[¶ 30] Resolution of this issue begins, as it should, with recognition that the cited development standard does, indeed, require that "the proposed subdivision is consistent with the approved sketch plan...." That statement must, however, be read within the context of the entire process of subdivision development in Park County. Sketch plan review and approval are tasks assigned to the planning coordinator and the Commission. Final plat and subdivision plan approval are, however, accomplished by the Board. There are a host of requirements that the developer must meet between sketch plan and final plat; while the final plat is to be *consistent* with the sketch plan, it need not be *identical* to it, or the entire process could end after the sketch plan was approved. Changes are anticipated. For instance, the Development Standards and Regulations provide that, at the sketch plan phase, the planning coordinator is "to alert the applicant to ... any issues which need to be addressed prior to final plat submittal."

[¶ 31] Specifically in regard to water, the Development Standards and Regulations require that a sketch plan be referred to the State Engineer, that the planning coordinator forward any concerns raised by the State Engineer to the developer, and that the developer "shall address these concerns to the satisfaction of the [State Engineer] prior to approval of the final plat." A completed sketch plan application is also subject to public review, including any comments as to how the proposed water system may negatively impact water quantity or quality, or may have inadequate water rights. Such provisions obviously contemplate modifications to the sketch plan.

[¶ 32] The Development Standards and Regulations governing final plat review and approval are somewhat more demanding in regard to a subdivision's water supply, but even then there is "breathing room." What is required is "[a]dequate evidence that a water supply sufficient in terms of quality, quantity, and dependability *will be available* to ensure an adequate supply of water to the type of subdivision proposed." (Emphasis added.) Stated a second time, the requirement is that "[a]dequate provision has been made for water supply ... in accordance with these regulations and Wyoming State Law." Finally, underscoring the built-in recognition that there will be some change between the sketch plan and the final plat, the Development Standards and Regulations require that "[n]o change has occurred which would result in an inability to make the

findings required for approval of sketch plats [sic]."

[¶ 33] The Board defends against Northfork's contentions by pointing out the above-mentioned Development Standards and Regulations (*see supra* ¶ 32), and by indicating that the change in Worthington's water supply plan—from water wells on individual lots to a centralized surface water source piped through a centralized water supply system—was actually a vast improvement. Further, Northfork's claim that an "irrigation use to domestic use" conversion was proclaimed by the planning coordinator to be an elemental part of the sketch plan is inaccurate. What the planning coordinator actually reported to the Board in an internal memorandum was as follows:

> **2001 Amendments—Water.** As noted above, the 2001 Amendments to the Subdivision Regulations established the Simple Subdivision Procedure. Consequently, Attachment E (Sketch Plan Submittal Requirements) applied to Simple Subdivisions only. It did not replace the Sketch Plan Submittal Requirements listed in the Subdivision Regulations since 1994.

> Accordingly, no information on water rights or water quality is required of any applicant as part of the Sketch Plan submittal for a subdivision. The Wyoming Department of Environmental Quality has not delegated its review of domestic water or sewer systems to Park County, and there is no one on County staff to review such data.

> [Northfork] refers to an "ever-changing water system" for this proposal. So far, the only change has been for the applicants to commit to a central water system rather than individual wells. This was in response to several concerns expressed by area residents prior to, and during, the November 30th public hearing. This proposed system must be approved by both Wyoming DEQ and the Wyoming State Engineer's Office, prior to the applicants' submitting a Final Plat for this subdivision. *This central water system is now an elemental part of the Sketch Plan for this project,* and if there are substantial changes in the future the approved Sketch Plan will need to be amended.

(Emphasis added.) A sketch plan was tendered with individual water wells. After staff input and public comment, a final plat was approved with a central water supply system. The Board did not err in determining that this was not such an "inconsistency" as to require denial of the final plat of the subdivision.

### *Is the Board's finding that the subdivision has a dependable water source supported by substantial evidence?*

[¶ 34] Wyo. Stat. Ann. § 18–5–306 (LexisNexis 2009) sets the minimum requirements that must be met before a subdivision permit may be granted. In regard to water supply, the statute provides in pertinent part as follows:

> (a) The board shall require ... the following information to be submitted with each application for a subdivision permit ...:

> ....

> (vi) A study evaluating the water supply system proposed for the subdivision and the adequacy and safety of the system. The study shall, at a minimum, include the following:

> ....

> (B) For all water supply systems except individual on-lot wells, a report submitted by the subdivider demonstrating the adequacy and safety of the proposed water supply system. The report shall address, at a minimum, the following issues:

> ....

> (VI) Where a centralized water supply system is proposed containing a new source of water supply to be developed, the report shall also demonstrate that the water supply system is *sufficient in terms of quality, quantity and dependability* and will be available to ensure an adequate water supply system for the type of subdivision proposed....

(Emphasis added.) Consistent with this statute, Park County's Development Standards

and Regulations provide in Section 3 of Chapter IV as follows:

. . . .

  b.  Final plat:

    . . . .

(2) Submittal Requirements for Final Plats: The following information shall be submitted with any application for final plat approval unless specific items are waived by the Planning Coordinator as unnecessary. . . .

(a) Written Material:

. . . .

Adequate evidence that a water supply *sufficient in terms of quality, quantity, and dependability* will be available to ensure an adequate supply of water to the type of subdivision proposed. . . .

(Emphasis added.)

■■■ [¶ 35] Northfork contends first that the conjunction "and" in both the statute and the regulation requires the subdivision developer to provide evidence not just of the quality and quantity of the water supply, but also of the dependability of that supply. *See Prickett v. Prickett*, 2007 WY 153, ¶ 11, 167 P.3d 661, 664 (Wyo.2007).[6] Next, Northfork notes the well-known principle that use of the word "shall" in both the statute and the regulation indicates that the requirements are mandatory. *See Stutzman v. Office of Wyo. State Engineer*, 2006 WY 30, ¶ 17, 130 P.3d 470, 475 (Wyo.2006). Northfork then equates the concept of "adequate evidence" with the legal term "substantial evidence," which we have defined as "relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions." *See Dale*, 2008 WY 84, ¶ 22, 188 P.3d at 561. Finally, Northfork argues that the record does not contain substantial evidence of the dependability of the subdivision's water supply, which is an "unperfected" 2005 surface right in the river. In fact, Northfork contends that the record contains

---

**6.** As part of this argument, Northfork also relies upon two well-known precepts of statutory construction: The same analysis is used to determine the meaning of administrative regulations as is used to determine the meaning of statutes.

*no evidence* that the water supply is dependable.

[¶ 36] Worthington first proposed as a water supply ground water wells on individual lots. Public comment and opposition led Worthington to propose, instead, a centralized system based upon converted irrigation rights. After additional public comment and opposition, Worthington again revised its water supply proposal, this time to surface water from the river along with an exchange of water from the downstream Buffalo Bill Reservoir. The final proposal, accepted by the Board, was for a 200 gallons per minute surface water supply from the river, with a 2005 priority date.

[¶ 37] Northfork concedes in its appellate brief that, given the subdivision's need for only 25 gallons per minute, the 2005 water right is adequate evidence of "quantity." Citing the dictionary definition of "dependable" as meaning "reliable," however, Northfork argues that Worthington's evidence fails that test. *See Merriam–Webster's Collegiate Dictionary* 310 (10th ed. 1999). Relying upon general concepts of Wyoming water law, Northfork argues that, in a dry year, a 2005 priority could be "shut off first" to satisfy earlier priorities. In fact, just such a "call" on the river in 1977 shut down all water rights in the area back to 1900 priorities.

[¶ 38] More specifically, Northfork argues that the Board unreasonably relied upon DEQ's "no adverse recommendation" report because the Board knew that the report was based upon inaccurate information as to the proposed water supply. The final plat was approved on March 7, 2006. About a week earlier, DEQ identified for a deputy Park County attorney "the key letter that I used to determine water was dependable (adequate)." That letter, dated September 30, 2005, was sent to DEQ from the State Engineer's Office. The substantive portion of the letter reads as follows:

*See State ex rel. Wyo. Dep't of Revenue v. UPRR Co.*, 2003 WY 54, ¶ 12, 67 P.3d 1176, 1183 (Wyo. 2003). Each word of a statute must be given meaning. *See In re MN*, 2007 WY 189, ¶ 4, 171 P.3d 1077, 1080 (Wyo.2007).

As was the case with the first submittal for this subdivision proposal, existing water rights as outlined under Wyoming Statute 18–5–306(a)(xi) have yet to be addressed. A tabulation of potentially subject rights was provided with the first State Engineer review comments. With the exception of the newly filed permit to recognize the proposed domestic supply use, and the yet to be filed reservoir permit to recognize the newly proposed recycling of treated wastewater for irrigation; the originally identified subject water rights remain identical to those identified under the first submittal.

Additionally, it is my understanding that the subdivider continues to pursue plans to purchase stored water in Buffalo Bill Reservoir, has applied for permits to drill several miscellaneous use wells, and is investigating changing all or part of the existing senior irrigation water rights (either temporarily or permanently) to domestic use within the subdivision. . . .

[¶ 39] As proof of its allegations, Northfork identifies portions of the agency record that show the following: (1) by October of 2005, the Board knew that Worthington had admitted in a petition filed with the State Engineer that issues of the sufficiency and reliability of its 2005 surface water permit required it to seek an additional source of supply in the form of reservoir water exchange; (2) by October of 2005, the Board knew that there would be no such reservoir water exchange; (3) by January of 2006, the Board knew that the final plat application listed no well water source of supply; and (4) by January of 2006, the Board knew there would be no conversion of irrigation water to domestic use. Finally, Northfork cites *Rodgers v. State ex rel. Wyoming Workers' Safety & Compensation Division*, 2006 WY 65, ¶ 23, 135 P.3d 568, 576 (Wyo.2006), as requiring administrative agencies to consider and weigh *all* material evidence offered by the parties, and to resolve conflicts in that evidence. To summarize, Northfork contends that it was unreasonable for the Board to conclude, from the record evidence, that a 2005 priority surface water right was a dependable source of supply for the proposed subdivision.

[¶ 40] The Board's response to these allegations is reflected in this sentence from its appellate brief: "A surface water permit granted by the State of Wyoming for 200 gallons per minute to a subdivision with a need for 25 gallons per minute from a riverway water source that has been flowing uninterrupted through geologic time amounts to an adequate and dependable water source." More particularly, the Board refers to the following portion of Resolution No. 2006–16, wherein the final plat and subdivision permit were approved on March 7, 2006, as proof that the Board did not act in ignorance of the fact that the proposed water source was limited to the river permit:

[T]he Board has reviewed the information presented itself, and finds that, the water system as reviewed herein is dependent solely on the May 2005 water permit and that the Board is not in its review considering the availability of domestic water from any wells located on the subject property or from irrigation rights or other source, though the Board recognizes that [Worthington] does have potential access to additional water for domestic purposes should [Worthington] seek to follow whatever necessary local, state and/or federal procedures exist in supplementing its 2005 direct flow water permit. . . .

[¶ 41] The Board also argues that Worthington's exploration of alternative water sources does not, *ipso facto*, mean that the surface water right is not dependable or is inadequate. Rather, the Board considers Worthington's efforts in that regard simply as evidence of Worthington's thoroughness in ensuring the dependability of its water supply. Finally, the Board argues that it recognized and addressed the potential risk of a call or regulation of rights on the river, when it stated as follows in Resolution No. 2006–16:

[O]pponents to this subdivision have submitted pleadings from a separate proceeding indicating that in 1977 there was a "call" on the Northfork of the Shoshone River during a dry year, however, the Board herein takes notice that in 1993 the Bureau of Reclamation completed a project

on the Buffalo Bill Dam and Reservoir which has allowed for significantly more water storage in Buffalo Bill Reservoir than existed in 1977 and that such additional storage creates significantly different and more favorable circumstances relating to satisfaction of water right than existed in 1977, including the availability of water in a State of Wyoming storage account available for purchase and/or exchange....

■ [¶ 42] In short, the Board found that the single incident of a call on the river in 1977, especially given a major change in circumstances after that date, was not such evidence of risk as to render the 2005 priority "undependable" as the subdivision's water supply. The findings of an administrative agency are given considerable deference during judicial review, meaning that the court does not disturb those findings unless they are clearly contrary to the overwhelming weight of the evidence. *Dale*, 2008 WY 84, ¶ 11, 188 P.3d at 558–59; *EOG Res., Inc. v. Dep't of Revenue*, 2004 WY 35, ¶ 12, 86 P.3d 1280, 1284 (Wyo.2004). In this instance, we cannot say that the Board's determination was contrary to the great weight of the evidence. Apparently, there has been one call on the river in recorded history. After that, reservoir storage was enhanced to alleviate area water shortage in the event of a similar dry year. The Board found that to be sufficient evidence of the dependability of the subdivision's water supply, and we will not second-guess the Board or substitute our judgment for that of the Board, where sufficient evidence exists in the record supporting that determination. Speculation that another dry year in the future potentially could cause a shortage does not overcome the record evidence.

### Did the Board's approval of the subdivision's open space plan violate county regulations?

[¶ 43] The subdivision is located on land that was zoned GR–5, which zone is de-scribed as follows in Park County Zoning Resolution Section 2–405 F:

**F. General Rural 5–Acre (GR–5).** The GR–5 district allows moderate-intensity land uses. Conventional subdivisions will average 5 acres per housing unit. A variety of uses is permitted in this district in recognition of the varied land uses typical of rural areas. *This district is also intended to promote the retention of open space, agricultural land, wildlife habitat, riparian habitat and scenic areas* and prevent development on unstable geologic features.

(Emphasis added.) The subdivision was actually developed, however, under Zoning Resolution 2–615 E, under the concept of "lot grouping:"

**E. Lot Grouping Requirements:** Grouped lot subdivisions shall meet all of the following requirements:

. . . .

3. *A minimum of 50 percent of the acreage of the parent parcel shall be open space configured as a separate parcel owned and managed by a homeowners' association or other entity* or as a contiguous area comprised of portions of individual building lots restricted against development by a conservation easement. Such areas shall meet the open space requirements of the subdivision regulations and shall be indicated on the plat or record of survey....

(Emphasis added.)[7] The Zoning Resolution contains the following pertinent definitions in Division 7–200:

**Open Space:** An area of land that is essentially unimproved and is set aside or reserved for agricultural purposes or to be maintained in a natural state.

**Parcel:** A contiguous area of land owned and recorded as the property of the same person or a single entity.

■ [¶ 44] Northfork contends that the Board violated these regulations by approv-

---

7. Although the Board makes the point that individual lots within the subdivision are to remain unfenced, which, in effect, adds what amounts to additional "open space," there is no suggestion in the record that the open space in the subdivi-sion is made up of portions of individual building lots. Rather, the open space in this subdivision falls under that portion of the zoning resolution highlighted above.

ing the subdivision's final plat where the open space provided for therein was not a single contiguous parcel, was not entirely undeveloped, and did not fulfill Park County's policy that open space promote wildlife habitat and migration. A review of the final plat reveals that, indeed, the open space in the subdivision consists of one very large tract north of the housing lots, three separate tracts of relatively significant size within the subdivision, but largely surrounded by houses, a "beltway" surrounding the entire subdivision, and several narrow corridors connecting these various tracts. There appears to be no dispute that, taken together, these tracts cover approximately 53% of the entire subdivision.

[¶ 45] The Board defends its approval of the subdivision's open space configuration with several arguments. First, it describes the subdivision as an "innovative design," apparently intending to mean that the open space configuration best fits the underlying subdivision design while meeting the purposes of the Zoning Resolution, because it allows open space to "pervade" the development. Next, the Board notes that the prohibition of exterior lot line fencing actually creates a much larger open space area than the specifically reserved 53%. The Board then notes that Northfork has incorrectly defined "open space" as specifically contemplating wildlife habitat and migration; neither of those terms being included in the definition of the term. The Board also points out the numerous connective corridors, and argues that any roadways crossing open space areas should be considered *de minimis*. Finally, the Board argues that it should be given broad discretion in interpreting and applying its own rule, and that its approval of the open space design is not clearly erroneous or contrary to the rule.

[¶ 46] We will affirm the district court and the Board as to the open space requirements for the following reasons. First, the final plat clearly shows the provision of open space that meets the definition contained in the Zoning Resolution. It is land "reserved for agricultural purposes or to be maintained in a natural state." In reaching this conclusion, we note that the GR–5 zone require-

ments list separately "open space, agricultural land, wildlife habitat, riparian habitat and scenic areas." The term "open space" is not, as is argued by Northfork, defined by the equivalent terms that follow it in that list. Rather, open space is defined as cited above from a separate section of the Zoning Resolution, which definition includes only "agricultural purposes" and "natural state." *See supra* ¶ 43. The Lot Grouping requirements make no mention of wildlife at all. And even if we construed "open space" to include "wildlife habitat," Northfork has not shown that wildlife will be any more inhibited in utilizing the open space within this subdivision as designed than it would be open space in a single-parcel configuration. In making that statement, we do not consider the migration patterns of any particular species of wildlife, there being nothing in the record suggesting a concern within the Zoning Resolution in that regard, and there being nothing in the record showing the disruption of the migration patterns of any particular species.

[¶ 47] Having reached these conclusions ourselves from reviewing the record, we cannot very well determine that the Board acted unreasonably or against the great weight of the evidence in concluding that this subdivision design meets the purposes of the Zoning Resolution's open space requirements. While we are not convinced that the numerous corridors make the separate tracts "contiguous," we are at the same time not convinced that the Board's acceptance of this "flaw" is so significant as to represent a violation of its own regulations.

[¶ 48] Our standard for reviewing agency determinations is well established. We give deference to an agency's findings of fact and we do not reverse them unless they are contrary to the great weight of the evidence, or not supported by substantial evidence. *Buehner Block Co. v. Wyo. Dep't of Revenue,* 2006 WY 90, ¶ 10, 139 P.3d 1150, 1153 (Wyo.2006). On the other hand, we review *de novo* the interpretation and application of law. *Id.* This dichotomous approach applies to mixed questions of fact and law. *Antelope Valley Improvement & Serv. Dist. v. State Bd. of Equalization,* 992

P.2d 563, 566 (Wyo.1999). We consider the reasonableness of the agency's exercise of judgment, and we defer to the agency's interpretation of the language it normally implements, unless clearly erroneous. *Buehner Block*, 2006 WY 90, ¶ 11, 139 P.3d at 1153; *Davis v. City of Cheyenne*, 2004 WY 43, ¶ 6, 88 P.3d 481, 484 (Wyo.2004); *Bryant v. State ex rel. Wyo. Dep't of Transp.*, 2002 WY 140, ¶ 9, 55 P.3d 4, 8 (Wyo.2002); *Swift*, 2002 WY 32, ¶ 10, 40 P.3d at 1238.

[¶ 49] In the instant case, the Board considered the requirements of the GR-5 zone, the Board considered the requirements of Lot Grouping, the Board considered the definition of "open space," and the Board concluded that the subdivision's open space configuration met the purposes of the Board's Zoning Resolution. The facts really are not at issue—the final plat is in the record. And we cannot say that the Board committed an error of law in determining—through the exercise of its judgment—that the open space tracts retained under the ownership of Worthington substantially complied with the open space requirements of the Zoning Resolution.

### *Was Northfork unlawfully denied intervention in the contested case hearing?*

[¶ 50] A brief review of some administrative law concepts may be helpful as we begin this discussion. The Wyoming Administrative Procedure Act (the WAPA) is found at Wyo. Stat. Ann. §§ 16–3–101 through 16–3–115 (LexisNexis 2009). By definition, a board of county commissioners is an "agency" subject to the WAPA. Wyo. Stat. Ann. § 16–3–101(b)(i); *Holding's Little America v. Bd. of County Comm'rs of Laramie County*, 670 P.2d 699, 701–02 (Wyo.1983). Certain lengthy and specific requirements for contested case hearings under the WAPA are found at Wyo. Stat. Ann. § 16–3–107. A "contested case" is defined as "a proceeding including but not restricted to ratemaking, price fixing and licensing, in which legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing... [.]" Wyo. Stat. Ann. § 16–3–101(b)(ii).

In turn, a "party" is "each person or agency named or admitted as a party or properly seeking and entitled as of right to be admitted as a party[.]" Wyo. Stat. Ann. § 16–3–101(b)(vi).

[¶ 51] Significantly, we have repeatedly interpreted these statutes to mean that a proceeding is only a contested case if it is a trial type hearing that is required by law. *In re Bd. of County Comm'rs, Sublette Co.*, 2001 WY 91, ¶ 13, 33 P.3d 107, 112 (Wyo.2001). The "trial type hearing" requirement does not come from the WAPA, itself, but from whatever underlying statute is at issue in the proceeding. *See, e.g., Foster's Inc. v. City of Laramie*, 718 P.2d 868, 874–75 (Wyo.1986); *Diefenderfer v. Budd*, 563 P.2d 1355, 1359 (Wyo.1977). In other words, if no statute or other law requires the "legal right, duties or privileges of a party" to be determined at a trial type hearing, no contested case proceeding is required.

[¶ 52] We raise this issue because, although all involved, at the time, treated the hearing that took place on July 12, 2006 as a contested case hearing, we have not been made aware of any underlying statute or administrative regulation that required Worthington's "appeal" of the five conditions placed upon the final plat and subdivision permit to be conducted as a trial type hearing. In its brief, Northfork cites Wyo. Stat. Ann. §§ 16–3–101 and 102 for the proposition that the WAPA "governs all contested case proceedings." While that is true to the extent that all contested case hearings held pursuant to WAPA must conform to the requirements of Wyo. Stat. Ann. § 16–3–107, it does not answer the question of whether a trial type hearing was required in this instance. Northfork also cites to *Rules for Contested Case Practice and Procedure Before the Park County Board of County Commissioners*, Ch. 1, § 1, but those Rules appear nowhere in the record.

[¶ 53] Belatedly, in a footnote in its appellate brief, the Board suggests that, "[d]espite having held one in this case, the Board does not believe that contested case hearings are applicable or necessary when a board of county commissioners reviews whether to grant or deny a discretionary land use per-

mit." This is, of course, an important question, because the contested case definitions and regulations of WAPA would not apply to a hearing that was not a contested case. We do not intend, at this late juncture, to say whether or not the reconsideration of permit conditions by a board of county commissioners is or should be a contested case proceeding. The hearing in this case was assumed by all to be a contested case hearing, was held as a contested case hearing, and has previously been judicially reviewed as if it were a contested case hearing. For the purposes of these related appeals, it was a contested case hearing.

[¶ 54] The next question is how the determination as to whether Northfork should have been allowed to participate in the hearing should have been made. In that regard, we previously have applied the requirements of W.R.C.P. 24(a) governing "intervention of right" in a civil action to the issue of who is "entitled as of right to be admitted as a party" in a WAPA contested case. *Amoco Prod. Co. v. Dep't of Revenue,* 2004 WY 89, ¶¶ 14–16, 94 P.3d 430, 437 (Wyo.2004). Neither party suggests an alternative approach. W.R.C.P. 24(a) provides as follows:

(a) *Intervention of right.*—Upon timely application anyone shall be permitted to intervene in an action:

(1) When a statute confers an unconditional right to intervene; or

(2) When the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

[¶ 55] In the instant case, we are concerned with the three requirements of W.R.C.P. 24(a)(2): one, that the applicant claims an interest in the subject of the action; two, that the applicant is so situated that the disposition of the action may as a practical

matter impair or impede the applicant's ability to protect that interest; and three, that the applicant's interest is not adequately represented by an existing party. We have already found in favor of Northfork in regard to the first two considerations. *See North-fork I,* 2008 WY 88, ¶¶ 12–16, 189 P.3d at 264–65. Upon remand, the district court found against Northfork on the third consideration:

The Court finds that [Northfork has] failed to satisfy the third requirement.... The [Board] was appropriately a party to the contested case hearing since it was acting in its regulatory capacity during the subdivision review process and not in its adjudicatory capacity. As such, the [Board] had an interest in determining the ability of the developer to plan and construct a subdivision within the parameters as set forth by the Park County subdivision regulations.

This Court can discern no reason why [Northfork's] interests are not completely aligned with the [Board's] interest with regard to the contested case proceeding. [Northfork] failed to identify any particular claims they would intend to make if allowed to intervene which show [Northfork's] interests are different than the [Board's] or that the [Board] would not adequately represent those interests.

(Internal citations omitted.) [8]

[¶ 56] Having reviewed this extensive record in great detail, we simply cannot agree with the district court's conclusion that the Board adequately represented Northfork's interests during the contested case proceedings. In fact, the record reveals the Board's unyielding opposition to any participation by Northfork throughout the entire process. The Board's attitude toward Northfork could more readily be described as adversarial than as representative. As we recognized in *Northfork I,* Northfork had particularized and protectable interests in the development, which interests do not ap-

---

8. The district court correctly points out that, technically, there are four requirements under W.R.C.P. 24(a), the fourth being timeliness of the filing of the application for intervention. *See*

*State Farm Mutual Auto. Ins. Co. v. Colley,* 871 P.2d 191, 194 (Wyo.1994). The question of timeliness has not been raised in this case.

pear from the record to have been shared by, no less championed by, the Board.

### *Remaining Issues*

[¶ 57] The remaining enumerated issues—road dedication, gated access, and multi-family dwellings—are all issues that were heard and decided at the contested case hearing. Because we conclude that Northfork was wrongfully deprived of its right to intervene in that hearing, those remaining issues will be remanded as well.

## CONCLUSION

[¶ 58] The fact that Worthington constructed the subdivision during the pendency of this appeal did not render moot the issues raised by Northfork. The Board did not violate state law or its own regulations in allowing county officials to waive the collection of certain information regarding the subdivision at early stages of the development, because the subdivision process provided that such information would be made available and evaluated prior to approval of the final plat and prior to granting of the subdivision permit. Changes in the water supply source during the development process did not render the final plat inconsistent with the sketch plan, inasmuch as the sketch plan process clearly contemplated such changes. The Board's conclusion that the subdivision's water supply was dependable was based upon substantial record evidence, with any potential conclusion to the contrary being mere speculation. The Board did not err as a matter of law in determining the open space configuration within the subdivision to be adequate under the Board's Zoning Resolution. The Board did err, however, in denying Northfork the right to participate in the contested case hearing.

[¶ 59] The district court and the Board are reversed to the extent set forth above, and the case is remanded to the district court for further remand to the Board for further proceedings consistent herewith.